STATE OF MINNESOTA

IN SUPREME COURT

A15-0267

Hennepin County                                                    Gildea, C.J.
                                                          Took no part, Chutich, J
State of Minnesota,

            Respondent,

vs.                                                        Filed:  May 18, 2016
                                                          Office of Appellate Courts
Maureen Ndidiamaka Onyelobi,

            Appellant.

_____

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Lee W. Barry, Assistant Hennepin County Attorney, Minneapolis, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Davi E. Axelson, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

1.      Because appellant's arrest was supported by probable cause, the district court did not err in denying appellant's motion to suppress evidence found as a result of the arrest.

2.      Because appellant failed to establish a prima facie case of discrimination as to one juror and failed to establish that the State's race-neutral reasons were pretextual regarding two additional jurors, the district court did not clearly err in rejecting

appellant's claim that the State's exercise of peremptory challenges violated *Batson v. Kentucky*, 476 U.S. 79 (1986).

3.     Because the jury instructions on accomplice liability accurately reflected Minnesota law, the district court did not abuse its discretion in instructing the jury.

Affirmed.

O P I N I O N

GILDEA, Chief Justice.

Following a jury trial, appellant Maureen Ndidiamaka Onyelobi was convicted of first-degree premeditated murder on an accomplice-liability theory, *see* Minn. Stat. § 609.185(a)(1) (2014).  On appeal, Onyelobi submits several claims of error.  First, Onyelobi argues that her arrest was not supported by probable cause and therefore evidence seized as a result of her arrest should have been suppressed.  Second, Onyelobi argues that the district court erroneously denied her jury selection challenges under *Batson v. Kentucky*, 476 U.S. 79 (1986).  Third, Onyelobi contends the district court erroneously instructed the jury regarding accomplice liability.  Finally, Onyelobi raises various contentions in a pro se supplemental brief.  Because Onyelobi's arrest was supported by probable cause, the district court did not clearly error when it rejected Onyelobi's *Batson* challenges or abuse its discretion when instructing the jury on accomplice liability, and Onyelobi's pro se contentions lack merit, we affirm.

This case arises from the murder of Anthony Fairbanks.  The State's theory was that Fairbanks, his sister, and their mother were all heroin addicts at the time of Fairbanks's death.  The State contended that a syndicate consisting of Onyelobi, her

2

boyfriend Maurice Wilson, and David Johnson supplied heroin to Fairbanks and his family.

In order to arrange a heroin purchase, Fairbanks and his sister would call a designated phone number (the 208 phone number). Wilson, Onyelobi, and Johnson each answered calls at the 208 phone number on behalf of the syndicate. The 208 phone number was linked to a white Samsung Galaxy cell phone that Wilson, the apparent leader of the syndicate, had acquired from Fairbanks in exchange for heroin. After the necessary arrangements had been made, Onyelobi, Wilson, and Johnson would arrive at the designated meeting place in a "two-tone van," with "an extra part on top" (the two-tone van). Either Onyelobi or Wilson was generally the driver of the two-tone van. Because the van had darkly tinted rear windows, it was not always apparent whether Johnson was present with Wilson and Onyelobi during the drug deals. The van was registered in Onyelobi's name.

Prior to his death, Fairbanks was indicted in the United States District Court for the District of North Dakota, for conspiracy to distribute and possession with intent to distribute heroin. Wilson was listed as the co-defendant on the indictment, and he was in custody in Cass County on these charges at the time of Fairbanks's death. But authorities had not yet apprehended Fairbanks.

At 7:34 p.m. on March 8, 2014, the day of Fairbanks's death, Wilson called Onyelobi at the 208 phone number from the Cass County jail.[1]  The relevant portion of the call began with Wilson asking Onyelobi if she and Johnson had "take[n] care of that," referring to Fairbanks.  After Onyelobi indicated that she and Johnson had not, Wilson replied, "Oh, man, baby, the countdown is on, man.  Seriously."  Wilson continued: "you're probably gonna wait till the last possible minute, man.  If they catch that dude, I'm gone for the rest of my life."  Onyelobi then explained that she and Johnson could not "catch [Fairbanks] [b]y himself."  Wilson responded that it was the "first thing" that Onyelobi and Johnson should have "t[aken] care [of]," and that they were "acting like they want[ed] [him] to stay in [jail]."  Onyelobi replied: "Well, we're gonna try to take care of this tonight then.  He's with somebody now.  He always with somebody so we'll just try to take care of it tonight."  Wilson repeated that if police caught Fairbanks, "[Wilson would be] done for the rest of [his] life"; that all police had to do was "pull [Fairbanks] over and run his name," and that "[Fairbanks is] in the f***ing projects doing dope every f***ing day."  Onyelobi then reassured Wilson, stating "We gonna get this s**t done tonight.  F**k it."

Johnson then requested to speak with Wilson.  Wilson told Johnson that "[this] s**t [is] critical" and that he needed Johnson to "be on top of that . . . ASAP."  Wilson further stated: "I go to court Monday, man. You feel me?"  Johnson stated:  "I got you. You know what I'm saying?  But the m*********er never by hi[m]self, though, so you

---

[1]     Signs posted on the Cass County jail telephones indicated that calls made were subject to recording.

4

know what I'm saying?"  Wilson, in response, told Johnson: "[I]f that's the case . . . let mom's[2] pull up . . . you walk up, down the street . . . Bump heads with a m*********er before they even get to her. . . . Y'all pick a place to meet up afterwards, around the corner."

Earlier that same day, Onyelobi rented a storage unit in Plymouth and received a personalized entrance code to the facility.  Surveillance video at the storage facility depicted Onyelobi accessing her unit for the first time around 4:15 p.m.  She arrived in the two-tone van, carried a duffel bag and cardboard box to the unit, returned to her vehicle, and drove away.  At 9:02 p.m., Onyelobi returned to her storage unit in the two-tone van, this time as a passenger.  After about 6 minutes, Onyelobi got back into the van, and the van departed.

Around 9:30 p.m. that same day, Fairbanks arrived at his mother's apartment building in Little Earth Housing.  Shortly thereafter, Fairbanks informed his sister that he was leaving to purchase heroin from Onyelobi.  Immediately before departing, Fairbanks's mother overheard Fairbanks tell someone on the phone:  "Yeah, Bro, I'm comin' right now, and I'm alone.  I'm not coming with anybody.  I'm by myself."  Fairbanks's mother did not know with whom Fairbanks was speaking.  After he left around 9:50 p.m., Little Earth Housing surveillance video showed Fairbanks walking southbound toward the location where his body was later discovered.

---

[2]       One of Onyelobi's nicknames is "mom."

Shortly before 10:00 p.m., M.C., a resident of a housing complex approximately two blocks away from Little Earth Housing, heard three gunshots from his second-floor room. M.C. went to his window and observed a body lying in front of a snowbank on the side of the road. M.C. further observed a running van stopped near the body for approximately 5 to 10 seconds; the van then began driving north.[3] M.C. was unable to see how many people were inside the van because the van was "dark." But M.C. was later able to identify the two-tone van as the vehicle he saw that night. At 10:04 p.m., M.C. called 911 to report his observations.

Police soon arrived and discovered Fairbanks's body lying in a large pool of blood. Fairbanks had been shot in the head four times from a relatively close distance. Police found four discharged bullet casings at the scene. EMTs pronounced Fairbanks dead. The cause and manner of Fairbanks's death was ruled a homicide. Autopsy results revealed that Fairbanks had heroin in his system at the time of death.

At 10:24 p.m. that same day, surveillance video showed Onyelobi's two-tone van returning to her storage facility. At that time, a male wearing a white jacket with a decal on the back exited the passenger side of the van and attempted to enter a passcode to the facility. Facility records confirmed that this male attempted to enter the personalized code Onyelobi had received. Access was denied because the facility closed for business at 10:00 p.m. As a result, the male reentered the passenger side of the van and the van departed.

---

[3]     The passenger side of the two-tone van was facing Fairbanks.

That same evening, between 10:00 and 11:00 p.m., Fairbanks's sister, S.F., met with Onyelobi and Johnson to acquire heroin. S.F. later told police that Onyelobi and Johnson arrived together in the two-tone van, but that she was unable to recall who was driving.

The next morning, Onyelobi returned to her storage facility in the two-tone van. Onyelobi gained access to her unit, and after a few minutes, she returned to the van. Video surveillance then showed the van departing.

During the investigation into Fairbanks's death, police located an Electronic-Benefits-Transfer card belonging to J.V. on Fairbanks's body. Police contacted J.V. and learned that the decedent was Fairbanks and that J.V. was his girlfriend. Police then contacted Fairbanks's mother and learned about the call Fairbanks received shortly before he was killed. Police subsequently determined that the call was received at 9:50 p.m. from the 208 phone number. Cell tower data further confirmed that the call from the 208 phone number was made in the area where police found Fairbanks's body.

On March 11, 2014, after discovering that S.F. frequently contacted the 208 phone number, police brought S.F. in for questioning. Contemporaneous with this questioning, police received word of Fairbanks's and Wilson's indictment in North Dakota. From this information, police learned that Wilson was in custody, that Onyelobi was his girlfriend, and that the two-tone van registered in Onyelobi's name matched the description of the vehicle seen leaving the scene of Fairbanks's death. Police subsequently printed a picture of Onyelobi and showed it to S.F., who identified Onyelobi as the person she knew as "Black," one of the three individuals from whom she purchased heroin and the person to

7

whom the 208 phone number belonged. S.F. indicated that her other two drug dealers were male, but that she did not know their real identities. The Violent Criminal Apprehension Team ("VCAT") was tasked with locating Onyelobi and bringing her in for questioning.

That same day, VCAT, using cellular data connected to the 208 phone number, determined that Onyelobi was staying at the Red Roof Inn in Plymouth. Hotel records confirmed that Onyelobi had been renting a room in her name since March 6, 2014, and was scheduled to stay through March 15. The two-tone van was parked in the Red Roof Inn lot when police arrived. Upon arriving at Onyelobi's room, Johnson answered the door. From the door, officers observed a racquetball-sized clear plastic bag containing a white substance. Recognizing the material in the bag as contraband, the officers entered the room, froze the scene, and awaited the arrival of search warrants. Onyelobi was not present when police entered the room, but she arrived at the Red Roof Inn approximately 30 minutes later.

Police thereafter obtained and executed a search warrant for Onyelobi's room. Along with two other cellular phones on one of the hotel beds, police discovered the white Samsung Galaxy phone connected to the 208 phone number. Police also located the white, decaled jacket that the person depicted in the surveillance video at Onyelobi's storage facility was wearing on the evening of March 8, 2014.

Onyelobi was arrested for the possession of a controlled substance and brought to the police station for further questioning. Following the reading of a *Miranda* warning, Onyelobi admitted to her relationship with Wilson but denied knowing Fairbanks or his

sister, or being involved in any way in Fairbanks's death. When police asked Onyelobi if it was "possible that she was just driving and that something happened that she didn't know [was going to happen]," Onyelobi maintained she was in no way involved with Fairbanks's death. Following this answer, police exited the interrogation room but continued to monitor Onyelobi via camera surveillance. Police then noticed Onyelobi attempt to force an object into an exposed electrical outlet. Police confiscated the object—a small key. Through further investigation, police determined that this key accessed Onyelobi's storage unit in Plymouth.

After obtaining a warrant, police accessed the storage unit and retrieved the cardboard box and duffel bag that Onyelobi was seen in video surveillance carrying into the unit. Inside the duffel bag, police located a small safe. Inside this safe was miscellaneous cash, a towel, and a loaded handgun. Two different forensic scientists thereafter concluded that the discharged bullet casings found near Fairbanks's body were fired from this handgun.

Forensic scientists also processed the handgun and its magazine for latent prints and DNA markers. Latent prints were discovered on both the handgun and the magazine. Onyelobi and Johnson could not be excluded as the source for these prints. DNA was also discovered on various portions of the gun. DNA found on the barrel of the gun indicated Fairbanks was the major contributor. DNA found on the grip of the gun indicated that 78 percent of the population, including Fairbanks, could be excluded, while Onyelobi and Johnson could not. Finally, DNA found on the magazine excluded

99.97 percent of the population, including Onyelobi and Fairbanks, but Johnson could not be excluded.

On June 12, 2014, a Hennepin County grand jury indicted Onyelobi with the first-degree premeditated murder of Fairbanks on an accomplice-liability theory. Over the course of two pretrial hearings, Onyelobi challenged probable cause for her arrest and requested that evidence seized following her arrest be suppressed. The district court denied Onyelobi's motion, concluding that there was probable cause for her arrest based on the possession of a controlled substance as well as the murder of Fairbanks.

The case proceeded to trial. On November 12, 2014, a jury found Onyelobi guilty of the first-degree premeditated murder of Fairbanks, *see* Minn. Stat. § 609.185(a)(1). The district court sentenced Onyelobi to life imprisonment without the possibility of release. This appeal follows.

I.

We turn first to Onyelobi's argument that the district court erred in concluding that there was probable cause for her arrest. Specifically, Onyelobi contends that because Johnson was the only person in the hotel room at the time VCAT officers observed the illegal narcotics, the officers could not have entertained an honest and strong suspicion that Onyelobi possessed the drugs. Onyelobi further argues that probable cause for murder was lacking because, at the time of arrest, the only thing linking her to the murder "was a phone number she sometimes used." Because Onyelobi claims that there was not probable cause for her arrest, she argues that the evidence police seized following her

10

arrest, including the contents of her storage facility, should have been suppressed. We disagree.

Where, as here, the facts are undisputed, we review the "pretrial order on a motion to suppress de novo."[4] *State v. Williams*, 794 N.W.2d 867, 871 (Minn. 2011). In doing so, we "determine whether the police articulated an adequate basis for the . . . seizure at issue." *Id.* (quoting *State v. Flowers*, 734 N.W.2d 239, 247-48 (Minn. 2007)). A seizure by warrantless arrest is reasonable if it is supported by probable cause. *Id.* Probable cause exists "when a person of ordinary care and prudence, viewing the totality of circumstances objectively, would entertain an honest and strong suspicion that a *specific* individual has committed a crime." *Id.* The quantum of proof required for a finding of probable cause is "more than mere suspicion but less than the evidence necessary for conviction." *Id.*

Applying that standard, it is clear that the police had probable cause to arrest Onyelobi. Specifically, the circumstances, assessed objectively, support a strong suspicion that Onyelobi possessed a controlled substance. To be guilty of unlawful

---

[4]    Onyelobi, pointing to cases from our court referencing review of probable cause determinations for clear error, asserts that our standard of review lacks clarity. We disagree. Our cases establish that when examining a pretrial order on a motion to suppress, we review "the district court's *factual findings* under our clearly erroneous standard," and the "*legal determinations*, *including* a determination of *probable cause*, de novo." *State v. Milton*, 821 N.W.2d 789, 798 (Minn. 2012) (emphasis added) (citing *State v. Diede*, 795 N.W.2d 836, 849 (Minn. 2011); *State v. Ortega*, 770 N.W.2d 145, 149 (Minn. 2009); *State v. Bradford*, 618 N.W.2d 782, 794 (Minn. 2000) ("This court affords great deference to an issuing judge's findings of fact, which we will reverse only if clearly erroneous. But we review de novo the determination of probable cause.") (citation omitted)).

11

possession of a controlled substance, it must be shown that the defendant, among other things, "consciously possessed [the substance], either physically or constructively." *State v. Florine*, 303 Minn. 103, 104, 226 N.W.2d 609, 610 (1975); *see State v. Ortega*, 770 N.W.2d 145, 150 (Minn. 2009) (explaining that an individual may constructively possess contraband singly or "jointly with another person," but "mere proximity to criminal activity does not establish particularized probable cause that a person is engaged in criminal activity"). Police did not see Onyelobi physically possess the drugs, but police had probable cause to believe that she constructively possessed them.

To establish constructive possession, the State must show either "(a) that the police found the substance in a place under defendant's exclusive control to which other people did not normally have access," or "(b) that, if police found it in a place to which others had access, there is a strong probability (inferable from other evidence) that defendant was at the time consciously exercising dominion and control over it." *Florine*, 303 Minn. at 105, 226 N.W.2d at 611; *see also In re Welfare of G.M.*, 560 N.W.2d 687, 695 (Minn. 1997) (explaining that there must be "something to connect the [contraband] with a certain individual"). Because Onyelobi was not present in her hotel room at the time police discovered the bag containing a controlled substance in plain view, and the room was instead occupied solely by Johnson, the second definition of constructive possession is the one at issue here. *See, e.g.*, *State v. Wiley*, 366 N.W.2d 265, 270 (Minn. 1985) (applying the second definition because others had access to the house searched and the bedroom in which the drugs were discovered was not under defendant's exclusive control).

Under that definition, the record confirms that Onyelobi constructively possessed the drugs in her hotel room. At the time VCAT officers departed for the Red Roof Inn, the collective knowledge of police[5] included, among other things, that: (1) Onyelobi was Fairbanks's and S.F.'s drug dealer; (2) Onyelobi dealt drugs with two other males; (3) Fairbanks and S.F. called the 208 number to acquire heroin and spoke with Onyelobi; (4) Fairbanks called the 208 number to acquire heroin 3 days earlier, immediately before his death; and (5) tracing technology placed the cell phone connected to the 208 number at the Red Roof Inn. Furthermore, when they arrived at the hotel, VCAT officers confirmed with Red Roof Inn staff that Onyelobi had been renting a room there since March 6, and that she had renewed her stay through March 15. VCAT officers also observed the two-tone van—which S.F. indicated was typically used by Onyelobi and Wilson in drug deals—located in the Red Roof Inn parking lot. After observing the bag of suspected narcotics in the room, VCAT officers also saw multiple cellular phones lying in plain view.[6] And while Onyelobi was not initially present inside the room, she arrived at the Red Roof Inn around 30 minutes later, confirming her occupancy. These facts are sufficient to give rise to an honest and strong belief that Onyelobi constructively possessed the suspected narcotics that police saw in her hotel room, either as sole

---

[5]     In instances in which more than one police officer is involved in an investigation, the "entire knowledge of the police force is pooled and imputed to the arresting officer for the purpose of determining if sufficient probable cause existed for an arrest." *State v. Riley*, 568 N.W.2d 518, 523 (Minn. 1997) (quoting *State v. Conaway*, 319 N.W.2d 35, 40 (Minn. 1982)) (alterations omitted).

[6]     According to police testimony, the carrying and use of multiple cell phones is common practice for those in the drug trade.

13

possessor or joint possessor with Johnson. *See Ortega*, 770 N.W.2d at 150 (highlighting

the reasoning that "drug dealers do not usually include innocent persons in their activity"

and that "contraband that is in plain view in a motor vehicle supports a rational inference

that all the vehicle occupants were aware of the contraband and had the ability and intent

to exercise dominion and control over the contraband").[7]

Because police had probable cause to arrest Onyelobi for possession of a

controlled substance, we hold that the district court properly denied Onyelobi's motion to

suppress evidence found as a result of the arrest.

II.

We turn next to Onyelobi's argument that the district court erred by overruling her

*Batson* challenges to the State's peremptory strikes[8] of jurors R.D., M.B., and N.F.

---

[7]    *See also State v. Lorenz*, 368 N.W.2d 284, 288 (Minn. 1985) (concluding constructive possession of drugs found in a common area of a shared apartment was properly inferred because the defendant had admitted to possessing other drugs); *State v. Colsch*, 284 N.W.2d 839, 841 (Minn. 1979) (concluding sufficient evidence for constructive possession existed where drugs were found, in defendant's residence, among male clothing as well as papers and a checkbook bearing defendant's name); *State v. Simon*, 275 N.W.2d 51, 52 (Minn. 1979) (concluding sufficient evidence for constructive possession existed where drugs were found, in addition to a passport, in the defendant's bedroom in a jointly leased and occupied mobile home).

[8]    Unlike challenges for cause, which are "limited" to instances in which the "juror cannot try the case impartially and without prejudice," peremptory challenges may be based on "sudden impressions, gestures, or a mere feeling"; indeed, "[a] prosecutor may exercise a peremptory challenge for any reason at all, as long as that reason is related to his view concerning the outcome of the case to be tried." *State v. Bowers*, 482 N.W.2d 774, 776 (Minn. 1992) (internal quotation marks omitted); *see also State v. Reiners*, 664 N.W.2d 826, 833 (Minn. 2003) ("Peremptory challenges allow a party to strike a prospective juror that the party believes will be less fair than some others and, by this process, to select as final jurors the persons they believe will be most fair.").

According to Onyelobi, the State's proffered race-neutral reasons for striking these jurors were mere pretexts for racial discrimination, and therefore she is entitled to a new trial. We are not persuaded.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution forbids the striking of prospective jurors based solely on their race. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986); *State v. Carridine*, 812 N.W.2d 130, 136 (Minn. 2012). We apply a three-step analysis to determine whether the exercise of a peremptory challenge was motivated by racial discrimination. *State v. Diggins*, 836 N.W.2d 349, 354-55 (Minn. 2013); *see also* Minn. R. Crim. P. 26.02, subd. 7(3)(a)-(c) (adopting the three-step *Batson* analysis).

First, the defendant bears the burden of making "a prima facie showing that the State exercised its peremptory challenge against a prospective juror on the basis of race." *Diggins*, 836 N.W.2d at 354 (internal quotation marks omitted). The defendant satisfies this burden by showing: "(1) that [one or more] member[s] of a racial minority has been peremptorily excluded *and* (2) that 'circumstances of the case raise an inference that the exclusion was based on race.'" *State v. Reiners*, 664 N.W.2d 826, 831 (Minn. 2003) (quoting *State v. Everett*, 472 N.W.2d 864, 868 (Minn. 1991)). It is well-settled that mere removal of "a member of a racial minority does not necessarily establish a prima facie case of discrimination." *Id.*; *see State v. White*, 684 N.W.2d 500, 505, 508 (Minn. 2004). An inference of racial discrimination can be drawn, however, upon "proof of disproportionate impact upon the racial group, *e.g.*, the prosecutor totally excluded all blacks from the venire." *State v. Moore*, 438 N.W.2d 101, 107 (Minn. 1989); *cf. State. v.*

*Greenleaf*, 591 N.W.2d 488, 501 (Minn. 1999) (concluding a prima facie case had not been made despite the peremptory removal of several women, as "the first two jurors selected were women, and a total of six women, including alternates, were seated on the jury"). An inference can also be drawn from all other surrounding circumstances, such as "the prosecutor's questions in voir dire," the "stated reasons" for exercising the peremptory challenge, or "established past patterns" of racial discrimination in the current jury's selection. *Moore*, 438 N.W.2d at 107.

Second, once the court is satisfied that a prima facie case has been made, the burden shifts to the State "to 'articulate a race-neutral explanation' for exercising the peremptory challenge." *Diggins*, 836 N.W.2d at 354 (quoting *Hernandez v. New York*, 500 U.S. 352, 358-59 (1991)). This reason "need not be 'persuasive, or even plausible' "; so long as discriminatory intent is not "inherent in the prosecutor's explanation, the reason offered [is] deemed race neutral." *Id.* at 355 (quoting *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995) (per curiam)).

Third, if the State proffers a facially race-neutral explanation for the strike, the district court must then assess whether the defendant carried the ultimate burden "of proving purposeful discrimination," i.e., whether the defendant proved that the reason given was "merely a pretext for the discriminatory motive." *Id.* (quoting *State v. Pendleton*, 725 N.W.2d 717, 726 (Minn. 2007)); *see State v. Bailey*, 732 N.W.2d 612, 618 (Minn. 2007) ("[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." (quoting *Purkett*, 514 U.S. at 768)). A district court may consider, as "one of the relevant circumstances," whether a

prosecutor's stated reason for a challenge will result in the "disproportionate exclusion" of members of a certain race or gender. *State v. Martin*, 614 N.W.2d 214, 223 (Minn. 2000) (quoting *Greenleaf*, 591 N.W.2d at 500). Disparate impact alone, however, "will not violate the principle of race neutrality, '[u]nless the [prosecutor] adopted a criterion with the intent of causing the impact asserted.' " *Id.* (quoting *Hernandez*, 500 U.S. at 362); *see also State v. Taylor*, 650 N.W.2d 190 (Minn. 2002) (emphasizing that disparate impact is "simply one" relevant consideration and is "not determinative" of pretext).

Because the district court can "only compare [a] challenged juror" to those jurors evaluated prior to the challenge, the district court's determination "must be supported by the record that existed at [the time of the challenge]." *Reiners*, 664 N.W.2d at 833 n.2. On review, we afford "great deference" to the district court's findings and reverse those findings only if clearly erroneous. *State v. Martin*, 773 N.W.2d 89, 101 (Minn. 2009); *Bailey*, 732 N.W.2d at 619 ("[I]f . . . the trial court believes the prosecutor's nonracial justification, and that finding is not clearly erroneous, that is the end of the matter." (quoting *Hernandez*, 500 U.S. at 375 (O'Connor, J., concurring))). This is because *Batson* challenges involve credibility-driven factual determinations and "the record may not reflect all of the relevant circumstances that the court may consider" in making its ultimate findings. *Martin*, 773 N.W.2d at 101. If discriminatory intent is ultimately found, the defendant "is automatically entitled to a new trial." *Carridine*, 812 N.W.2d at 136-37.

*Juror R.D.*

The State used its third peremptory strike to remove juror R.D., the fifteenth prospective juror to be questioned and the second to self-identify on the jury questionnaire as "Black or African American." The first prospective juror to so identify, juror D.B., a Ghanaian woman, was selected by the State to serve on the jury.

Juror R.D. testified that he grew up in a large family on the west side of Chicago near areas where gang-related activity was prevalent. "Quite a few" of R.D.'s family members have had "trouble with the system." He has also "made some mistakes." At the age of 18 or 19, R.D. was convicted of burglary. He served 5 1/2 years in prison. He believed he was treated "very" fairly. When asked by the State if he had "any other contact with police officers, traffic stops, [or] routine contact," R.D. stated that he "was pulled over and furthermore . . . was in an accident two and a half weeks ago." Upon further questioning by the State, R.D. stated that since his burglary conviction, his contacts with the justice system had been minimal. In general, R.D. believed that the system "works okay if you're innocent." R.D. believed he could be fair to both sides.

Following R.D.'s testimony, the State exercised one of its peremptory challenges. Onyelobi interposed a *Batson* challenge, arguing that the State's removal of R.D., as the "first African American on the panel after 15,"[9] established a prima facie case of racial

---

[9]     Onyelobi excludes juror D.B., a Ghanaian woman, in her calculation, arguing that only "African Americans" should be counted because those born in Africa do not share life experiences akin to those born and raised in the U.S. Onyelobi does not cite to any cases from our court, however, to justify such a distinction, and we decline to adopt such a distinction here.

discrimination. Without first ruling on whether a prima facie case had been made, the district court turned to the State for its race-neutral reasons under prong two. The State offered the following reasons for striking R.D.: (1) he has a "number of contacts with the criminal justice system," including a criminal conviction and "spen[ding] five and a half years in prison"; (2) he has "numerous family members who have had contact with the criminal justice system"; and (3) he failed to "disclose a DWI conviction from 2004" after he was given "numerous opportunities" to do so. The district court then asked Onyelobi to "comment on if those are race-neutral reasons and then go onto the third prong." Onyelobi responded that "the State [was] aware of other people who didn't disclose minor infractions";[10] that the State never specifically asked R.D. whether he had a DWI conviction; and that, as an African American, R.D. was bound to have had more contacts with police, which means the reason for the strike was not race-neutral.

Following this discussion, the district court denied the challenge and made its findings, stating initially: "I do want to address all three of the prongs." First, the court found a prima facie case had not been made. In particular, the court explained that a single strike of a minority juror was "probably not enough by itself," that there was no discernible "attempt by the State to single out people of color or ask them any special set of questions," and that D.B., a person of color, had already been selected as a juror. Next, the court found that although personal and familial contacts with the justice system "may apply to poor people or people of color more frequently," it was a race-neutral basis

---

[10] But Onyelobi did not then, and does not now, identify the persons to whom she was referring.

19

and the "State ha[d] every reason to be concerned."  Finally, the court noted that there was "no indication" of pretext.

On appeal, Onyelobi asserts that the district court never found whether a prima facie showing had been made for R.D.'s strike, and because the district court nevertheless proceeded to prongs two and three, we should likewise bypass prong one and decide the challenge based on prongs two and three.  Although it is true that the district court did not immediately make a ruling at the conclusion of each prong, choosing instead to first consider each of the three prongs, the court later made express findings, including that Onyelobi had failed to establish a prima facie case of discrimination.[11]

The district court did not clearly err in ruling that Onyelobi failed to establish a prima facie case of discrimination.  As we have consistently held, the mere removal of a member of a racial group does not necessarily establish a prima facie case—an inference of racial discrimination based on the surrounding circumstances is also required.  *White*, 684 N.W.2d at 508.  Here, prior to the strike of R.D., the State had selected D.B., a

---

[11]     The district court proceeded with this approach for all of the *Batson* challenges made by Onyelobi.  We have emphasized "[t]he importance of clarity at each step of the [*Batson*] analysis," and that generally a district court should make its rulings sequentially at the conclusion of its consideration of each prong, including whether the challenger has established a prima facie case, before considering prongs two and three.  *See State v. Pendleton*, 725 N.W.2d 717, 725 (Minn. 2007) (quoting *Reiners*, 664 N.W.2d at 832).  We reaffirm that this is the optimal procedure.  But here, unlike in *Pendleton*, the district court did not conflate the three prongs so as to obscure its discrete analysis of each prong, and therefore we need not alter our usual deferential standard of review.  *See Pendleton*, 725 N.W.2d at 726-27 (stating that "where the district court erred in applying *Batson*, we will examine the record without deferring to the district court's analysis" and that "we do not defer to the district court's analysis" because it "collapsed the *Batson* analysis into one step").

person who self-identified as "Black or African American," to serve on the jury. Because Onyelobi does not identify the existence of any circumstances raising an inference of discrimination beyond R.D.'s mere removal, and given that D.B. was selected prior to R.D.'s strike, *see White*, 684 N.W.2d at 507-08, we hold that the district court's determination that Onyelobi had not made a prima facie case of discrimination was not clearly erroneous.

*Juror M.B.*

Juror M.B. was the twenty-fifth prospective juror to be questioned and the fourth to self-identify as "Black or African American."[12] M.B. was convicted of selling cocaine in Illinois in 1975 and served 2 years of probation. She unequivocally believes she was not treated fairly. M.B. believes her charge was "trumped up," that a police officer lied on the stand, and that she was wrongfully convicted.

The prosecutor's questioning was limited to these matters, and immediately upon confirming M.B.'s belief that a police officer lied on the stand and that she was wrongfully convicted, the prosecutor exercised a peremptory challenge. Onyelobi countered with a *Batson* challenge, arguing its "prima facie case [was] simply" that the State's removal of M.B. constituted the removal of "two-thirds of the limited number of African Americans . . . seen so far." Anticipating the court would allow the attorneys to argue their respective positions prior to making its ultimate findings, Onyelobi volunteered her position on pretext, asserting that removing a juror based on negative

---

[12]  Jurors D.B. and P.B. were both accepted by the State. Juror R.D. was not.

21

contacts with police, which people in poor and black communities deal with more often, serves to disproportionately remove African Americans and therefore could not be race-neutral. The State then argued that no prima facie case had been made, noting that "two African American women" were already seated on the jury and the subsequent removal of a person of color, standing alone, was not sufficient to establish a prima facie case. The State further noted its race-neutral reasons for the strike: (1) that M.B. believed she had been wrongfully convicted; and (2) that M.B. believed a police officer committed perjury.

The district court again denied the challenge. First, the court found a prima facie case had been made. Specifically, it noted that "[o]rdinarily just the race of the person is not a factor but here it's a subsequent removal so I think there is a prima facie case." Next, the court found that the State's cited reason—"the negative experience involving the criminal justice system"—was race-neutral. Finally, the district court rejected Onyelobi's pretext argument, reasoning that "other jurors of color ha[d] been selected and accepted by the State," and that the "challenge relate[d] specifically to the removal of a person who [allegedly] had a . . . horrible experience [with the justice system]," which "would alone justify the [removal]."

The district court's finding of a prima facie case may not completely align with our precedent. *See, e.g.*, *Angus v. State*, 695 N.W.2d 109, 117 (Minn. 2005) (concluding that the existence of prior strikes of racial minorities based on unchallenged race-neutral reasons or mere concern that "this would be the second African American juror" struck

22

by peremptory challenge was not enough to raise an inference of discriminatory motive). But we need not resolve this issue because Onyelobi's claim fails on the third prong.

M.B.'s belief that a police officer committed perjury and that she had been wrongfully convicted, either standing alone or viewed together, provide a lawful, non-discriminatory basis to exercise a peremptory challenge. The district court's finding that Onyelobi did not prove pretext therefore was not clearly erroneous. *See Martin*, 773 N.W.2d at 104.

*Juror N.F.*

Juror N.F. was the thirty-fourth prospective juror to be questioned, the first of the potential alternates to be questioned, and the fifth to self-identify as "Black or African American." Juror N.F. grew up in a Christian household and is a Jehovah's Witness. When asked by the district court if she had any religious objections to the presumption of innocence, she responded: "Not really." The court then asked if she could presume the defendant innocent, to which she responded, "I have no idea." After clarifying that she did not understand the question, N.F. indicated that she could presume Onyelobi innocent. The court further asked N.F. if she could set aside her sympathies and emotions and base her decision in the case on the law and evidence. N.F. responded: "I don't know . . . I personally am just too sensitive. I'm a visual person and I don't know what's going to come before me. That's my cause and issues. So I don't know, to be honest with you." The court also asked N.F. to clarify what she meant when she stated "[l]ife is precious" in her juror questionnaire. N.F. explained that she "hold[s] life precious," and consequently, she did not "feel comfortable with that type of [murder]

23

case" because she did not know how she was "going to react." N.F. continued: "[T]his whole thing is just stressing me out. I just don't know if I'll be able to do it." N.F. told the court that she did not believe that she would be unfair to anybody.

N.F., however, indicated on her questionnaire, in response to whether she could objectively view graphic photos, that she believed she could not be fair. When asked to explain, N.F. stated that she "was thinking about [her] emotional state because [she didn't] know how [viewing the photos was going] to affect [her] as far as going forward." While being questioned, N.F. agreed that she could view the photos objectively. Nonetheless, N.F. expressed concerns about her "well-being." Finally, N.F. indicated on her questionnaire that she thought her religious beliefs could make it difficult to be a juror. N.F. explained: "I think about whether or not I will be thinking about the fact that I'm a Witness. Is that going to affect me? Will I not be able to judge this . . . fairly when I think about it?"

Following this response, the State exercised a peremptory challenge. Onyelobi answered with a *Batson* challenge, arguing a prima facie case existed because the State had now removed three of the four prospective African American jurors that had come before the court. Onyelobi continued by stating her position on pretext, asserting that previous jurors had expressed initial reservations about viewing graphic photos and the State still accepted those jurors. The prosecutor, in response, noted that he believed N.F. should be excused for cause in light of her answers on the questionnaire regarding her inability to be fair, notwithstanding her in-court explanation. The State then provided its race-neutral reasons, including that: (1) N.F. "clearly indicated that she'd have an

24

extreme difficulty looking at relevant evidence"; (2) due to her religion, N.F. had concerns about her ability to be fair; (3) there were concerns about her ability to remove her emotions from her decision-making; and (4) as a result, there were concerns about N.F. being a "good fit" in an emotionally charged homicide case.

The district court denied the challenge and made its findings. First, the court found a prima facie case had been made due to the "pattern" the "defense points out." The court, moving to prong two, then "agree[d] with all . . . four grounds or reasons stated by [the prosecutor]." The court further noted N.F.'s "reluctance" to accept, or her inability to understand, applicable legal requirements; the court's assumption that "somebody was going to strike her after" the questioning was done; and the court's overall observation that the prosecutor "has had very good reason to think that . . . the jurors he struck would not be sympathetic to his side." The court accordingly denied Onyelobi's pretext argument, reasoning that it "believe[d] the [prosecutor's] reasons and [had also] observed them."

As with M.B.'s removal, we need not resolve whether the district court's finding of a prima facie case was clearly erroneous because Onyelobi's claim fails on the third prong. Onyelobi argues that N.F. was asked questions about familial contacts with the justice system and the ability to be fair regardless of race, while other white jurors were not. Furthermore, Onyelobi contends that N.F. was removed based on a concern—a hesitancy to view graphic photos—that any reasonable, fair-minded person would have, and "several other seated jurors did" have, but those other jurors were not removed by the State. The record does not support these contentions.

25

Turning first to the claim of disparate questioning, the record does not reflect, based on our thorough review, that the prosecutor asked only black individuals about their ability to be fair regardless of race. Rather, the record confirms that the prosecutor asked this question of both black and white prospective jurors in similar ways as part of a similar set of questions. This line of questioning is therefore not suggestive of pretext.

As to familial contacts with the justice system, in N.F.'s case, the prosecutor evidently followed up on this topic because N.F. specifically noted, on her questionnaire, "some issues with family and [her] spouse being charged with a crime," as well as her preference to "[a]nswer [or explain] in person." Each of the prospective jurors was asked to complete the same juror questionnaire containing the exact same questions regarding personal and familial contacts with the justice system. *See Martin*, 773 N.W.2d at 103. The record does not support Onyelobi's allegation that the State was asking jurors of color any special set of questions to discriminate against them surreptitiously; instead, it is evident that the prosecutor was merely following up based on specific answers by N.F. on the juror questionnaire.

With respect to Onyelobi's second contention, it is true that if a question asked by a prosecutor would "elicit[] the same response[] from any fair-minded person," only asking this question of jurors of a particular race and then striking them based on their reasonable answer would "not [be] race neutral." *State v. McDonough*, 631 N.W.2d 373, 385 (Minn. 2001) (citing *State v. McRae*, 494 N.W.2d 252, 257 (Minn. 1992)). But we have distinguished such selective questioning from instances in which, prior to voir dire, "all jurors were asked the same questions in the juror questionnaire," including, for

26

example, questions "about their opinions of the criminal justice system and any concerns about how that system treats people of color." *Martin*, 773 N.W.2d at 103. Likewise here, prior to voir dire, each juror was asked about their ability to objectively and fairly examine graphic photos in a standard juror questionnaire. There is therefore no supportable inference that the prosecutor asked N.F. about her ability to view graphic photos only so he could cite her answer to the question as the reason for striking her to rebut a *Batson* challenge.

Furthermore, Onyelobi's comparative juror claim—that N.F. was removed because of her expressed discomfort with viewing graphic photos, while others were not—oversimplifies the inquiry and is without merit. We have held that "[o]ne way to show purposeful discrimination is to show that a prosecutor's proffered reason for striking a prospective minority juror applies equally to a similar non-minority who is permitted to serve." *Bailey*, 732 N.W.2d at 618 (citing *Miller-Ek v. Dretke*, 545 U.S. 231, 241 (2005)). But we have also "compared strikes of members of the panel who were allegedly similarly situated, and noted that differences between the members of the panel supported the conclusion that there was no pretext for the strike." *Carridine*, 812 N.W.2d at 138. Specifically, we have held that prospective jurors are not similarly situated unless they possess the full "combination of factors" and characteristics cited by the State. *See id.* at 139. Onyelobi points to no other jurors selected by the State to sit on the jury who shared the same tentativeness that N.F. exhibited. Furthermore, Onyelobi struck a prospective white juror for the very same reason now cited as being pretextual. In particular, Onyelobi argued that juror I.B.'s expressed discomfort and uncertainty as to

how she would handle viewing graphic photographs was the basis for removal for cause (the district court disagreed and Onyelobi instead exercised a peremptory challenge). Based on our review, we hold that the district court's finding that there was no pretext was not clearly erroneous.

III.

We turn next to Onyelobi's argument that the district court's accomplice liability instructions were erroneous. At the close of trial, the district court instructed the jury that Onyelobi was charged with one count of first-degree premeditated murder and one count of second-degree intentional murder.[13] More specifically, the court instructed that "[b]oth of these counts are charged under Minnesota's Aiding and Abetting law" and accordingly, both "involve the concept . . . of 'aiding and abetting.' " Aiding and abetting, the court explained, subjects the defendant to criminal liability "even though someone else actually committed the criminal acts, provided the defendant intentionally aided, advised, hired, counseled, conspired with, or otherwise procured the other person to commit the crime."[14]

The district court then told the jury that in order to aid and abet another:

[T]he defendant must, first, have *knowledge* that *a crime* will be committed or is being committed, and second, she must *intend* that her actions or presence further the commission of *the crime*. Mere presence at the scene

---

[13]   Because Onyelobi was ultimately convicted of only first-degree murder, we limit our discussion of the jury instructions to that count.

[14]   This was a near verbatim recitation of Minn. Stat. § 609.05, subd. 1 (2014), captioned "Liability for the Crimes of Another."

28

of a crime, without more, is not enough for you to impose liability under the Aiding and Abetting law. Such a person is merely a witness. However, a person's presence does constitute aiding and abetting if it is done *knowing* that *a crime* will be or is being committed and *intending* that it further the commission of *the crime*.

The law further provides that a defendant who intentionally aids and abets another person in the commission of a crime is not only guilty of the *intended crime*, but also of any other crime which was a reasonably foreseeable and probable consequence of trying to commit the *intended crime*.

(Emphasis added.)[15]

Immediately following this aiding and abetting instruction, the district court instructed the jury on murder, further referencing the concept of aiding and abetting liability:

So as to Count I: Premeditated Murder in the First Degree, Minnesota law provides that whoever, while intentionally aiding and abetting another, causes the death of a human being with premeditation and with the intent to kill that person or another person is guilty of *the crime of Premeditated Murder in the First Degree*.

. . . *The crime of Premeditated Murder in the First Degree* consists of four elements which are:

---

[15]     Prior to the court's final instructions, Onyelobi requested the court "instruct the jury as follows after reading the aiding and abetting instruction":

In other words, a person is is [sic] guilty of aiding and abetting First Degree Murder if the state has proven beyond a reasonable doubt that:

1. The person knew of the accomplice's premeditation and intent to kill; or
2. The person shared the accomplice's premeditation and intent to kill; or
3. The accomplice's premeditation and intent to kill was reasonably foreseeable to the person as a probable consequence of committing or attempting to commit the crime the person intended.

First, the *defendant, or someone that she was intentionally aiding and abetting*, caused the death of Anthony Fairbanks;

Second, the *defendant, or someone that she was intentionally aiding and abetting*, acted with the intent to kill Anthony Fairbanks or another person;

. . . .

Third, the *defendant, or someone that she was intentionally aiding and abetting*, acted with premeditation;

. . . .

And the fourth element is that the defendant's act took place on or about March 8th, 2014, in Hennepin County, Minnesota.

(Emphasis added.) The court thereafter turned to the attorneys for closing arguments.

Onyelobi argues that these instructions were erroneous for three reasons. First, in contravention of the Supreme Court's holding in *Rosemond v. United States*, ___ U.S. ___, 134 S. Ct. 1240 (2014), the district court's general instruction on accomplice liability allowed the jury to find Onyelobi guilty of aiding and abetting first-degree murder even if she intended only to aid and abet some different or lesser crime. Second, this instruction erroneously omitted a requirement that Onyelobi's presence or aid actually furthered (i.e., was efficacious in) the commission of the charged offense. Third, the court's instruction on expansive liability failed to specify the originally "intended crime" from which the jury could conclude that first-degree murder was a reasonably foreseeable and probable consequence. We consider each argument in turn.[16]

---

[16] The State argues that Onyelobi failed to object to the jury instructions and therefore her claims must be reviewed on appeal for plain error. *See State v. Ramey*,

(Footnote continued on next page.)

A.

We turn first to Onyelobi's contention that the general instruction on accomplice liability was erroneous because it permitted the jury to find that she aided and abetted first-degree murder even if she intended only to aid and abet some different or lesser crime. A district court has broad discretion in formulating jury instructions; however, it abuses that discretion "if the jury instructions 'confuse, mislead, or materially misstate the law.' " *State v. Taylor*, 869 N.W.2d 1, 14-15 (Minn. 2015) (quoting *State v. Kelley*, 855 N.W.2d 269, 274 (Minn. 2014)). In order to assess whether an instruction correctly states the law in a way the jury can understand, we view the instructions "as a whole," *Kelley*, 855 N.W.2d at 274, and analyze "the criminal statute and the case law under it." *Taylor*, 869 N.W.2d at 15.

---

(Footnote continued from previous page.)
721 N.W.2d 294, 297-98 (Minn. 2006) (noting that an alleged "unobjected-to error," i.e., an error "not brought to the attention of the trial court," can be reviewed on appeal "only if it constitutes plain error affecting substantial rights" (quoting Minn. R. Crim. P. 31.02)); *see also* Minn. R. Crim. P. 26.03, subd. 19(4). We agree that her latter two arguments were not raised before the district court and are thus reviewed only for plain error. But we reject the State's contention that Onyelobi's first argument must be reviewed for plain error. Although Onyelobi agreed at trial that the court's instructions were "accurate and correct," she nevertheless argued that they were "misleading" and "confusing"—which relates to the first issue she raises here. Onyelobi argued that the court should either adopt her proposed instruction—which she contended "would focus the jury more on the issues"—or that the court "give some instruction which indicates that [Johnson's] intent is not automatically inferred to her" for purposes of accomplice liability. This discussion was sufficient to bring the issue "to the attention of the trial court," and thus this issue will be reviewed under the normal abuse-of-discretion standard. *See also White*, 684 N.W.2d at 508 ("A defendant's failure to propose specific jury instructions . . . before [final instructions] are given . . . generally constitutes waiver . . . .").

31

Onyelobi argues the district court's accomplice liability instruction, which used the phrases "a crime" and "the crime," left open the possibility that the jury convicted Onyelobi based not on her knowledge and intent to aid the commission of premeditated murder, but on her knowledge and intent to aid some lesser "crime," such as terroristic threats. We disagree.

Onyelobi does not point to any authority requiring a district court to specifically identify and substitute each criminal count in place of the word "crime" when it instructs the jury on accomplice liability. Even assuming there were such a requirement, the instructions as a whole make clear that the crime at issue was premeditated murder.

Immediately following the *general* instruction on accomplice liability, the court gave the specific instruction on first-degree premeditated murder—the crime Onyelobi was charged with aiding and abetting. Moreover, the accomplice liability instructions provided by the district court were near verbatim recitations of the Minnesota accomplice liability statute.[17]

---

[17] Minnesota Statutes § 609.05, "Liability for crimes of another," states in relevant part:

> Subdivision 1. Aiding, abetting; liability. A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime.

> Subd. 2. Expansive liability. A person liable under subdivision 1 is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by the person as a probable consequence of committing or attempting to commit the crime intended.

But, Onyelobi argues, the instructions are not consistent with the U.S. Supreme Court's holding in *Rosemond v. United States*, ___ U.S. ___, 134 S. Ct. 1240 (2014). At issue in *Rosemond* was the propriety of the district court's jury instructions regarding aiding and abetting a violation of 18 U.S.C. § 924(c) (2012), a dual-pronged crime involving (1) the use of a firearm, (2) in connection with a crime of violence or a drug-trafficking crime. ___ U.S. at ___, 134 S. Ct. at 1243. The Court concluded that the district court's instruction, which permitted a finding of guilt based on the defendant's knowledge of the presence of a firearm subsequent to his participation in the underlying trafficking offense, was erroneous. *Id.* at ___, 134 S. Ct. at 1251. A proper instruction should have "explain[ed] that [the defendant] needed advance knowledge of a firearm's presence." *Id.* More specifically, the erroneous instruction allowed the jury to convict based on the intent "to advance some different or lesser offense"—simple drug trafficking—while accomplice liability was predicated upon a finding of intent extending "to the specific and entire crime charged"—that is, armed drug trafficking. *Id.* at ___, 134 S. Ct. at 1248 (emphasis added). The Court also found it significant that the district court's error had been magnified by statements in the prosecutor's closing arguments, which essentially "invited the jury to convict Rosemond even if he first learned of the gun as it was discharged, and no matter what he did afterward." *Id.* at ___, 134 S. Ct. at 1252. Even if *Rosemond* were consistent with Minnesota's accomplice liability law—a question we need not decide—it does not help Onyelobi here.

Unlike the instruction in *Rosemond,* the aiding and abetting instruction in this case did not permit the jury to find Onyelobi guilty of aiding and abetting first-degree murder

even if she intended only to aid and abet some different or lesser crime. Under the instructions given in this case, the jury could only find Onyelobi guilty if she had knowledge that *a* premeditated murder would be committed or was being committed, and also found that she intended her actions and presence to further the commission of *the* premeditated murder. Moreover, unlike *Rosemond,* we are not confronted with a dual-pronged crime consisting of a primary act (i.e., drug trafficking) in conjunction with a penalty-enhancing secondary act (i.e., while using a firearm). And here, we are not confronted with an instruction that permitted the jury to find Onyelobi guilty based upon her learning of Johnson's intent to kill subsequent to the act's commission. Nor did the prosecutor make such an argument; instead, he argued Onyelobi knew all along that the plan was to murder Fairbanks.

In short, the district court's instructions did not leave room for the jury to convict Onyelobi of first-degree premeditated murder as an accomplice when she merely intended to aid in some crime other than murder.

## B.

We turn next to Onyelobi's contentions that the district court erred by failing to (1) add an efficacy element to the general instruction on accomplice liability, and (2) specifically identify the "intended crime" when instructing the jury on expansive

34

liability. Onyelobi did not raise either of these issues before the district court, and therefore we review for plain error.[18]

We squarely decided, just last year, that both of these contentions lack merit. *State v. Taylor*, 869 N.W.2d 1, 15-17 (Minn. 2015). At oral argument, Onyelobi conceded that *Taylor* answers both questions, but requested that we reconsider. Onyelobi, however, offers nothing to suggest that our decision in *Taylor* was in error, and our review evinces no good reason, much less a "compelling" one, to conclude otherwise. *Schuette v. City of Hutchinson*, 843 N.W.2d 233, 238 (Minn. 2014) (requiring a "compelling reason" to overrule precedent (quoting *State v. Martin*, 773 N.W.2d 89, 98 (Minn. 2009)). The district court's instructions, which were in accord with the holdings of *Taylor*, therefore were not plainly erroneous.

## IV.

Finally, Onyelobi raises four issues in her pro se supplemental brief. First, Onyelobi asserts the district court erred in allowing the State to ask leading questions of S.F. using inadmissible hearsay. We review evidentiary rulings for an abuse of

---

[18] Under the plain error doctrine, the appellant must demonstrate: (1) an error; (2) that is plain; and (3) that affects substantial rights. *Kelley*, 855 N.W.2d at 274. An error is "plain" if it is "clear or obvious" based on the law as it exists at the time of appellate review. *Id.* An "error" exists where there is a "[d]eviation from a legal rule." *Id.* at 275, 277. And a plain error "affect[s] substantial rights" when the appellant satisfies the "heavy burden" of showing "there is a reasonable likelihood that giving the instruction in question had a significant effect on the jury verdict." *Id.* at 283 (quoting *State v. Gomez*, 721 N.W.2d 871, 880 (Minn. 2006)). If the appellant successfully satisfies these three prongs, "we may correct the error only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quoting *State v. Crowsbreast*, 629 N.W.2d 433, 437 (Minn. 2001)).

discretion. *In re Source Code Evidentiary Hearings in Implied Consent Matters*, 816 N.W.2d 525, 537 (Minn. 2012).

At trial, S.F. testified that she had not identified Onyelobi by the nickname "Black" to police, but that police had to come to that conclusion on their own. In response, the State asked S.F. if she remembered testifying under oath at a prior hearing that she had in fact told police that she knew Onyelobi as "Black." S.F. responded in the affirmative.

If a witness testifies at trial, is subject to cross-examination, and has made a statement that is inconsistent with previous sworn testimony, the previous sworn testimony is non-hearsay. Minn. R. Evid. 801(d)(1)(A). In this case, when S.F. unexpectedly changed her testimony at trial with respect to knowing Onyelobi by the nickname "Black," the State appropriately cited her prior inconsistent sworn testimony. The district court therefore did not abuse its discretion by allowing the State to use this testimony.

Onyelobi next argues that the district court erred in allowing the prosecutor, in closing arguments, to make improper analogous references to cases of robbery and kidnapping to explain the concept of reasonable foreseeability to the jury. We disagree. The prosecutor did not compare Onyelobi and her alleged crime to burglary and kidnapping, nor is there any indication that the prosecutor attempted to engender prejudice or sympathy by referencing those crimes. Rather, the prosecutor referred to robbery and kidnapping as a vehicle for explaining "reasonable foreseeability" in the context of expansive liability under the accomplice liability statute. This page and a half

of the closing arguments, furthermore, was in reference to the State's secondary theory of the case—expansive liability—and was by no means the focus of the closing arguments or trial. We therefore decline to afford Onyelobi a new trial on this basis.

Onyelobi also argues that the district court erroneously allowed the prosecutor to misstate the evidence during closing arguments. Our review of the record, however, evidences only permissible inferences by the State. Even if we were to agree that the prosecutor misstated the evidence, the district court expressly instructed the jurors to rely on their own memory and review of the evidence, not on the representations of the attorneys. *See Taylor*, 650 N.W.2d at 207 (stating that "[w]e presume that the jury follow[s] the court's instructions," and declining to order a new trial on a claim of misstated evidence (citing *State v. Ferguson*, 581 N.W.2d 824, 835 (Minn. 1998)). We accordingly decline to order a new trial on this basis.

Onyelobi lastly argues that absent the fruits of her illegal arrest, the evidence was insufficient to convict. Because we conclude, however, that the district court properly admitted the fruits of Onyelobi's arrest, we consider that evidence, including the storage locker key and contents, in our review. When "view[ing] the evidence in the light most favorable to the verdict and assum[ing] that the jury disbelieved any evidence that conflicts with th[at] verdict," we reject Onyelobi's claim of insufficient evidence and conclude that the jury "could reasonably have found [Onyelobi] guilty of" aiding and abetting the first-degree premeditated murder of Fairbanks. *See State v. Bahtuoh*, 840 N.W.2d 804, 809 (Minn. 2013).

In sum, we conclude that Onyelobi's pro se claims lack merit.

Affirmed.

CHUTICH, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.