STATE of Minnesota, Respondent,

v.

Andy Leo DeVERNEY, Appellant.

No. C9–98–436.

Supreme Court of Minnesota.

April 15, 1999.

Rehearing Denied June 2, 1999.

Michael A. Hatch, Atty. Gen., Catherine M. Keane, Asst. Atty. Gen., St. Paul, Marvin E. Ketola, Carlton County Atty., Thomas H. Pertler, Asst. County Atty., Carlton, for respondent.

John M. Stuart, State Public Defender, Melissa Sheridan, Asst. State Public Defender, St. Paul, for appellant.

## OPINION

LANCASTER, J.

Andy Leo DeVerney was indicted and convicted of aiding and abetting the first-degree murder of Paul Antonich. DeVerney now appeals his conviction on numerous grounds. We affirm.

At approximately 8:30 p.m. on August 28, 1996, 17-year-old Antonich was driving to his parents' home when he rear-ended a vehicle driven by John Steven Martin at the intersection of Sixth Avenue East and Ninth Street in Duluth. John Steven Martin and four of his friends, Lester Greenleaf, Jamie Aubid, John Alexander "Mike" Martin and appellant, Andy DeVerney, who had all been drinking, exited the vehicle that had been driven by John Steven Martin and began verbally and physically assaulting Antonich. DeVerney admits that he may have hit Antonich through the open window of the vehicle, but did not specifically remember doing so.

Following this initial assault, Greenleaf got into the driver's seat of Antonich's car and the other four men, including DeVerney, got back into the vehicle driven by John Steven Martin. Both vehicles then sped away from the scene of the accident and proceeded to the intersection of 15th or 16th Street West and 3rd Street where the men again exited the vehicle driven by John Steven Martin. Several of the men again struck Antonich, knocking him to the ground. Mike Martin testified that DeVerney was one of the men who struck Antonich at this location.

After this second assault both Greenleaf and DeVerney got into Antonich's car, with Greenleaf behind the wheel, DeVerney in the passenger seat, and Antonich in the back seat, and followed the vehicle driven by John Steven Martin onto Interstate 35. Both cars proceeded for several miles to Ditchbank Road in a remote area on the Fon du Lac reservation outside Cloquet. DeVerney testified that he got out of the car to urinate, then went to John Steven Martin's car and got a beer. The other men then exited the vehicles and John Steven Martin shot Antonich four times, killing him. While Aubid, John Steven Martin, and Mike Martin placed Antonich in the trunk of his car, Greenleaf and DeVerney wiped down Antonich's car inside and out to remove any fingerprints. After John Steven Martin drove Antonich's car into a drainage ditch, he got back in the vehicle he had been driving and drove all five men back to Duluth.

The following morning all five men got together, drove to the Blatnik Bridge in Duluth, and threw the gun used to kill Antonich into Lake Superior. Later that afternoon, a logger discovered Antonich's car in the drainage ditch and alerted authorities. Police officers had the vehicle towed out of the drainage ditch and discovered Antonich's body in the trunk.

St. Louis County medical examiner Dr. Donald Kundel performed an autopsy and

concluded that Antonich's death was a homicide. Dr. Kundel testified that the cause of death was two gunshot wounds, one to the heart and one to the right forehead. Antonich suffered two other gunshot wounds, one to the neck and one to the chin. Antonich had also been severely beaten, as evidenced by blunt trauma to his ear, eyes, head, face, jaw, nose, forehead, neck, shoulders and chest. Dr. Kundel estimated that Antonich had sustained between 50 and 100 blows with either fists or feet. Investigators also found large amounts of blood in Antonich's vehicle, including Greenleaf's blood on the driver's side door and seat. Greenleaf's blood was also found on a cloth in the trunk of John Steven Martin's car.

Earlier on the morning after the murder, Mike Martin had talked to a friend, Lawrence Murray, about someone having been killed the night before. After Murray saw news reports about Antonich's death, he called authorities. The following day, August 30, 1996, police officers arrested Mike Martin. On August 31, 1996, Mike Martin admitted his involvement in Antonich's murder. On May 8, 1997, Mike Martin reached a plea agreement with authorities wherein he would plead guilty to aiding and abetting second-degree murder and testify against the other four accomplices. The plea agreement allowed the court to reduce Martin's sentence 25 percent to 50 percent for testifying truthfully.

Greenleaf and DeVerney left Duluth on August 29, 1996, to attend a weekend pow-wow on the Red Lake Reservation. On August 31, 1996, reservation authorities arrested both men. On September 1, 1996, DeVerney gave a statement to police. At first, DeVerney denied any knowledge or involvement in the murder, but gradually told officers the specifics of his involvement in the murder. DeVerney admitted punching Antonich three or four times during the second assault.

On September 17, 1996, a Carlton County grand jury returned an indictment charging DeVerney with aiding and abetting first-degree murder (intentional killing during a kidnapping) in violation of Minn.Stat. §§ 609.185, subd. 3 (1998) and 609.05, subd. 1 (1998). The trial court granted the state's motion for a change of venue and the trial was held in Dakota County. DeVerney's trial was joined with the trial of codefendant Greenleaf. During the codefendants' trial, over DeVerney's objection, the state presented evidence regarding an assault DeVerney committed a month and a half prior to Antonich's murder.[1] The jury found DeVerney guilty of aiding and abetting first-degree murder (intentional killing during a kidnapping), and he was sentenced to life in prison.[2]

DeVerney appeals this decision on the following grounds: (1) that joinder of his trial with Greenleaf's was improper; (2) that the state improperly used its peremptory challenges to remove two Native Americans from the jury pool; (3) that the trial court erred by allowing into evidence the testimony of Mike Martin; (4) that the trial court erred by prohibiting DeVerney from cross-examining Mike Martin regarding the exact amount of time his sentence would be reduced under his plea agreement; and (5) that DeVerney was improperly tried on a charge not included in the indictment.

## I.

■ DeVerney first argues that the trial court committed reversible error when it granted the state's motion for a joint trial and denied his subsequent motion for severance, and that as a result of the joint trial he suffered substantial prejudice. Minn. R.Crim. P. 17.03, subd. 2(1), states:

When two or more defendants shall be jointly charged with a felony, they shall be tried separately or jointly *in the discretion of the trial court.* In making its determination on whether to order joinder or separate trials, the court shall consider the nature of the offense charged, the impact on the victim, the potential prejudice to the defendant, and the interests of justice.

---

1. Such evidence is commonly referred to as *Spreigl* evidence after this court's decision in *State v. Spreigl,* 272 Minn. 488, 139 N.W.2d 167 (1965).

2. Additional facts adduced during the joint trial of codefendants Andy Leo DeVerney and Lester Greenleaf can be found in our opinion in *State v. Greenleaf,* 591 N.W.2d 488 (Minn.1999).

(Emphasis added.) In reviewing a trial court's decision regarding the joinder of defendants, we make "an independent inquiry into any substantial prejudice to defendants that may have resulted from their being joined for trial." *State v. Hathaway*, 379 N.W.2d 498, 502 (Minn.1985).

We have said that joinder is proper when two defendants act in close concert with one another. *See State v. Strimling*, 265 N.W.2d 423, 432 (Minn.1978). DeVerney argues that he and Greenleaf acted separately. The evidence, however, does not support that position. The evidence, instead, indicates that DeVerney and Greenleaf had very similar involvement in Antonich's murder. Both either admitted assaulting Antonich or were seen doing so, both admitted sitting in the front seat of Antonich's vehicle as they drove to the site of the murder, and both admitted attempting to wipe down Antonich's car for fingerprints in an effort to hide any evidence that would link them to the crime. We conclude DeVerney and Greenleaf acted in close concert with one another.

DeVerney also claims that he suffered substantial prejudice as a result of his trial being joined with Greenleaf's. First, he argues that the two defendants presented different, and conflicting, defenses. DeVerney's defense was that he was not guilty, while Greenleaf's defenses were that he was not guilty, that he was intoxicated, or that he was acting under duress. DeVerney and Greenleaf presented different defenses, but substantial prejudice is not simply whether the defenses presented were different, but whether the defenses were inconsistent, or whether the defendants sought, through their chosen defenses, to shift blame to one another. *See Hathaway*, 379 N.W.2d at 503.

The trial court held a pretrial hearing, during which it reviewed each defendant's statement to police, and concluded that, by joining the two defendants for trial, the jury would "not be forced to believe either the testimony of DeVerney or the testimony of Greenleaf. Instead, the jury will be faced with a choice between the State's theory or the theories expounded by both Defendants." It is clear from the evidence and the defenses presented by each defendant that neither sought to shift the blame to the other. Both defendants simply claimed that they did not intend to kill Antonich, or that they had an excuse for aiding and abetting his murder. Therefore, the fact that each defendant offered different defenses did not cause DeVerney to suffer substantial prejudice.

DeVerney also argues that evidence admissible only against Greenleaf prejudiced DeVerney because the jury could not consider such evidence only against one defendant. DeVerney's argument is essentially that he did not believe the jury could weigh the evidence against each defendant independently. The trial court stated, after listening "carefully to the questioning of each juror surrounding the issue of joinder during voir dire, * * * I'm satisfied that the jury will be able to separately decide the two cases without prejudice to either defendant." We have consistently "recognized the ability of juries in joint trial to separate evidence that inculpates only one defendant from evidence that inculpates both." *Hathaway*, 379 N.W.2d at 502. The jury was also instructed at the time the evidence was offered against Greenleaf, and again at the close of the case, to consider the evidence only against Greenleaf and not DeVerney. *See State v. James*, 520 N.W.2d 399, 405 (Minn.1994) (holding that if the evidence and the instruction are neither complex nor confusing, it must be presumed that the jury understood and followed the court's instruction). The fact that some evidence admitted at trial was admissible only against Greenleaf did not cause DeVerney to suffer substantial prejudice.

DeVerney also contends that the trial court's effort to redact the codefendants' statements—made necessary because of the joinder—was ineffective because the evidence still alluded to DeVerney's existence. In accordance with Minn. R.Crim. P. 17.03, subd. 3(2), the trial court properly redacted from each codefendant's statements any reference to the other codefendant. However, a police officer testified that Greenleaf stated he was with four other individuals on the night of Antonich's murder. The officer then named three of the four individuals, omitting only DeVerney's name. DeVerney claims

that this "obvious omission clearly pointed to [him] as the fourth companion." The error complained of, if any, was harmless because in DeVerney's own statement to police, and again in his testimony at trial, he admitted that he was present during the assault, kidnapping, and murder of Antonich.

DeVerney argues that the courtroom style of his lawyer and counsel for Greenleaf antagonized the judge and alienated the jury. We have examined these allegations in the context of the trial and found them to be insignificant. Any prejudice to appellant is purely speculative and did not deprive him of a fair trial. Similarly, the behavior of Greenleaf during the trial was not such that it deprived DeVerney of a fair trial. We conclude, after a careful review of the record, that DeVerney did not suffer substantial prejudice as a result of the joinder.

## II.

▮▮▮ DeVerney next contends that the state improperly used its peremptory challenges to strike the only two Native Americans from the jury pool. The use of peremptory challenges to exclude persons from the jury solely on the basis of race is prohibited by the Equal Protection Clause of the United States Constitution. *See Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The Supreme Court in *Batson* set out a three-step process to determine whether a peremptory challenge was motivated by a racially discriminatory intent. *See id.* A trial court's determination to sustain a peremptory challenge will not be reversed absent clear proof that the prosecution's stated reason for making the peremptory challenge was pretextual. *See State v. Moore*, 438 N.W.2d 101, 107 (Minn. 1989).

▮▮▮ First, the defendant must make a prima facie showing that the challenge was exercised on the basis of race. *See Batson*, 476 U.S. at 96, 106 S.Ct. 1712. We have stated that "[a] prima facie case of racial discrimination is established by showing that one or more members of a racial group have been peremptorily excluded from the jury and that circumstances of the case raise an inference that the exclusion was based on

race." *State v. Stewart*, 514 N.W.2d 559, 563 (Minn.1994). In this case, because DeVerney is a Native American and both Native American jurors were struck, a prima facie case was established.

▮▮▮ Second, after establishing a prima facie showing, the burden shifts to the prosecution to articulate a race-neutral reason for the challenge. *See Batson*, 476 U.S. at 97, 106 S.Ct. 1712. We have stated that the explanation provided by the prosecutor does not have to be "valid" in the sense of establishing a reasonable basis for challenge, but must instead be race-neutral. *See State v. McRae*, 494 N.W.2d 252, 254 (Minn.1992). The Supreme Court does not require a "persuasive, or even plausible" explanation. *See Purkett v. Elem*, 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). "At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent was inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez v. New York*, 500 U.S. 352, 358–59, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

▮▮▮ Here, the prosecutor gave twelve reasons why he struck one of the jurors, and six reasons why he struck the other. As to the first Native American struck, those race-neutral reasons included the juror's negative feelings toward government and law enforcement in particular, her sympathy for a brother in prison for criminal sexual misconduct, her feud with a sister employed as an attorney by the state, her admission that she held views that were "different," and her view that numerous assaults against her family members were "not serious," even though bones had been broken. As to the second Native American struck, the prosecutor's race-neutral reasons included the juror's admitted sympathy towards the defendants, the juror's acquaintance with Red Lake community members, some of whom were potential witnesses, the fact that the juror's wife was on probation for welfare fraud, and the juror's prior conviction for driving under the influence of alcohol.

This list of reasons provided sufficient non-race-based justifications for the strikes. *See*

*Batson,* 476 U.S. at 89, 106 S.Ct. 1712 (holding that a prosecutor may exercise a peremptory challenge " 'for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried") (citation omitted); *see also State v. Scott,* 493 N.W.2d 546, 549 (Minn.1992) (upholding the use of a peremptory strike on a potential juror who answered, "probably, yeah," when asked whether she could follow the judge's instruction).

■■■ Third, after the prosecutor has given a facially valid race-neutral explanation, then the trial court, considering all of the relevant evidence bearing on the issue, must determine whether the defendant has proven that the prosecutor acted with discriminatory intent or purpose. *See Hernandez,* 500 U.S. at 362–66, 111 S.Ct. 1859; *see also State v. Gaitan,* 536 N.W.2d 11, 15 (Minn.1995). If a prosecutor had a racially discriminatory intent or motive in striking a juror, a defendant is automatically entitled to a new trial because harmless error impact analysis is "inappropriate in the case of a defendant convicted by a petit jury if there was racial discrimination in the selection of that jury." *McRae,* 494 N.W.2d at 260.

■■■ If the basis for the challenge given by the prosecutor is one that will result in the disproportionate exclusion of members of a certain race, the trial court may consider the exclusion as one of the relevant circumstances bearing on the determination whether the facially valid reason given by the prosecutor is a pretextual explanation offered to mask a discriminatory intent. *See Hernandez,* 500 U.S. at 363, 111 S.Ct. 1859. However, considerable deference must be given by a reviewing court to the trial court's finding on the issue of intent because the finding typically will turn largely on an evaluation by the trial court of credibility. *See id.* at 366–69, 111 S.Ct. 1859.

The trial court, taking into consideration all the relevant factors, properly determined that DeVerney failed to demonstrate that the prosecutor acted with discriminatory intent or purpose, and we therefore affirm the trial court's ruling.

## III.

DeVerney next argues that Mike Martin should not have been allowed to testify because his plea agreement exceeded the proper limits of inducements the state is allowed to offer in return for testimony. DeVerney's argument is based on his belief that, as part of the plea agreement, the trial court could reduce Martin's sentence depending on how well he testified. This argument is misplaced. The plea agreement states that Martin was only required to testify truthfully at each trial. The plea agreement does not indicate that the trial court would review the outcome of the cases in determining what sentence Martin would receive. Rather, it indicates Martin agreed that, in exchange for his truthful testimony, he would receive a sentence ranging from 163 to 244½ months.

■■■ The decision to allow an accomplice to plead guilty to a lesser crime if the accomplice provides truthful information and testimony is a proper exercise of a prosecutor's authority. *See State v. Jones,* 392 N.W.2d 224, 232 (Minn.1986) (citing A.B.A. Standards for Criminal Justice, The Prosecution Function, Standard 3–3.9(b)(vi)). "Such negotiations do not necessarily make an accomplice's testimony so unreliable that it must be excluded from evidence, for they in no way bind the witness' testimony; he or she is free to testify truthfully and fully without fear of reprisals on the part of the government." *Id.* The plea negotiations in this case "did not condition the state's acceptance of the witnesses' guilty pleas to second-degree murder on the successful conviction of [the defendant]; they were not inducements to commit perjury." *Id.* Therefore, the trial court did not err in permitting Mike Martin to testify.

## IV.

DeVerney next argues that his right of confrontation, as provided for by the Minnesota Constitution and the Sixth Amendment to the United States Constitution, was violated because he was not allowed to cross-examine Martin regarding the precise number of years or months that Martin's sentence could be reduced by the trial court.

■ The trial court, while prohibiting DeVerney from inquiring as to the exact number of months Martin's sentence could be reduced, did not prohibit DeVerney from cross-examining Martin regarding every other aspect of the plea agreement, including the percentages by which Martin's sentence could be reduced. As the Supreme Court held in *Kentucky v. Stincer*, "[t]he Confrontation Clause guarantees only 'an opportunity for cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" 482 U.S. 730, 739, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985)). Therefore, we affirm the trial court's decision to prohibit DeVerney from cross-examining Martin regarding the number of months his sentence could be reduced because the limitation did not prevent DeVerney from discrediting Martin's testimony as biased.

## V.

DeVerney argues that the trial court violated his constitutional right to prepare a defense, contending the trial court improperly instructed the jury on a theory of vicarious liability which was not included in the indictment. The indictment filed against DeVerney reads as follows:

That on or about the 28th day of August, 1996, in the Township of Perch Lake, in the County of Carlton, State of Minnesota, Andy Leo DeVerney, then and thereby being, individually and aiding and abetting and acting in concert with another, to-wit: John Alexander Martin, John Steven Martin, Jamie Lee Aubid and Lester Dale Greenleaf, did wrongfully, unlawfully, intentionally and feloniously, with intent to effect the death of a human being, to-wit: Paul Martin Antonich, cause the death of the said Paul Martin Antonich while committing kidnapping, said death being caused by shooting the said Paul Martin Antonich, thereby causing the said Paul Martin Antonich to die on the 28th day of August, 1996.

The indictment goes on to state that the crime was committed in violation of "[Minn Stat. § ] 609.185, Subd. 3; § 609.05, Subd. 1—murder in the first degree while committing kidnapping (aid & abet)."

Minnesota Statute section 609.05, captioned "Liability of Crimes of Another," and commonly referred to as the aiding and abetting statute, provides in relevant part:

Subd. 1. A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime.

Subd. 2. A person liable under subdivision 1 is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by the person as a probable consequence of committing or attempting to commit the crime intended.

■ At the close of the state's case, the state indicated that it would seek aiding and abetting instructions under both subdivisions 1 and 2, and at the close of all the evidence, the trial court instructed the jury on both. DeVerney objected, arguing that because the indictment did not include the subdivision 2 theory, he had not had an opportunity to prepare a defense.

As the United States Supreme Court has stated: "It is ancient doctrine of both the common law and of our Constitution that a defendant cannot be held to answer a charge not contained in the indictment brought against him." *Schmuck v. United States*, 489 U.S. 705, 717, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). However, there are exceptions to this rule. Specifically,

The court may permit an indictment or complaint to be amended at any time before verdict or finding if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced.

Minn. R.Crim. P. 17.05; *see also Gerdes v. State*, 319 N.W.2d 710, 712 (Minn.1982) (stating that "the matter of allowing amendments to complaints under Minn. R.Crim. P. 17.05 is in the sound discretion of the trial judge"). While the indictment was never formally amended pursuant to Rule 17.05, the appellant argues that the jury instruction resulted

in an impermissible variance. In such a case, we examine the issue using a rule 17.05 analysis. *See State v. Ostrem*, 535 N.W.2d 916, 922 (Minn.1995); *see also State v. Gisege*, 561 N.W.2d 152, 159 (Minn.1997) (conducting a 17.05 analysis when a conviction is at variance with the indictment).

The first question in a Rule 17.05 analysis is whether the additional vicarious liability instruction resulted in DeVerney being charged with an "additional or different offense." *See* Minn. R.Crim. P. 17.05; *State v. Ostrem*, 535 N.W.2d at 922; *Gerdes*, 319 N.W.2d at 712. In this case, the indictment charged DeVerney with the substantive offense of first-degree murder. The additional instruction did not change the substantive offense; it remained first-degree murder. The only difference between the indictment and the final instruction was that the final instruction included an additional form of aiding and abetting. We have long held that aiding and abetting is not a separate substantive offense and can be added at any point prior to a verdict or finding. *See Ostrem*, 535 N.W.2d at 923 (stating that "[i]t is undisputed that aiding and abetting is not a separate substantive offense"); *State v. Ortlepp*, 363 N.W.2d 39, 45 (Minn.1985); *State v. Alexander*, 290 Minn. 5, 5–10, 185 N.W.2d 887, 890 (1971); *State v. Britt*, 279 Minn. 260, 263–65, 156 N.W.2d 261, 263–64 (1968). We have also held that a jury can convict a defendant of aiding and abetting a substantive crime despite the absence of any "aiding and abetting" language in the complaint. *See State v. Lucas*, 372 N.W.2d 731, 740 (Minn.1985); *State v. DeFoe*, 280 N.W.2d 38, 40 (Minn.1979).

DeVerney argues that he was placed in a situation analogous to that of the defendant in *State v. Vorey*, 41 Minn. 134, 43 N.W. 324 (1889). However, DeVerney's reliance on *Vorey* is misplaced. In *Vorey*, the defendant was charged with rape under one subdivision of the statute (force) and the state apparently sought, and the trial court gave, a second rape instruction based on a different subdivision (fear of bodily harm). *Id.* We reversed

the conviction, stating: "[t]he indictment should charge the acts constituting the alleged rape so as to advise the accused in which one of these different ways he is charged with having committed the crime." *Id.* The key distinction between this case and *Vorey* is that rape is a substantive offense, while aiding and abetting is not. The instruction in DeVerney's case did not result in him being charged with an additional or different offense.

The second question is whether DeVerney's substantial rights were prejudiced by the additional aiding and abetting instruction. *See* Minn. R.Crim. P. 17.05; *Ostrem*, 535 N.W.2d at 923; *Gerdes*, 319 N.W.2d at 712. We have held that the opportunity to prepare a defense in a criminal case is a substantial right. *See State v. Dickson*, 309 Minn. 463, 467, 244 N.W.2d 738, 741 (1976) (citing *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)). In this case, subdivision 2 was not specifically cited in the indictment. Including each of the applicable aiding and abetting subdivisions in the indictment is the better practice.[2] However, failing to do so in this case did not cause DeVerney to suffer substantial prejudice.

At the close of the state's case, DeVerney made a motion for judgment of acquittal. In its response, the state indicated that it would seek an instruction on section 609.05, subd. 2. Thus, before DeVerney put on any evidence he had actual notice of the state's intention to rely on subdivision 2. On appeal, DeVerney states that this notice came too late. However, he does not point to any specific way in which his case would have been presented differently had he been informed at the outset of the state's reliance on subdivision 2. DeVerney argues that his trial counsel had relied on the indictment in fashioning his opening statement, cross-examining the state's and codefendant's witnesses, deciding which defense witnesses to call, and in advising DeVerney himself about whether

---

**2.** At oral argument the state admitted that the omission of subdivision 2 was a typographical error. Counsel for the state said the grand jury "intended to indict on both theories. * * * I believe * * * that it was simply an inadvertent mistake at the time that the indictment paper was actually typed up."

to testify. Because only the opening statement and cross-examination of the state's witnesses occurred prior to DeVerney being placed on notice that the state intended to seek an instruction based on subdivision 2, we have focused on those portions of the trial. First, DeVerney's opening statement attempted to reference the aiding and abetting instructions. However, the trial court properly instructed the jury in response to an objection that the court, not counsel, would instruct them on the law. In addition, the jury was instructed that arguments by counsel were not evidence, and we presume that the jury was able to follow this instruction. *See State v. Peou,* 579 N.W.2d 471, 475 (Minn.1998). Second, DeVerney has not identified any way in which he would have proceeded differently with cross-examination.

Our review of the record in this case reveals that DeVerney's defense was that he was not a participant in the murder. He alleged that the murder was committed by John Steven Martin, possibly aided by Mike Martin and Jamie Aubid. DeVerney argued that he was not the person who drove Antonich's car to the place of the second beating or to the murder site, that he was surprised by the shooting, and that he was not an active participant in the events of the night in question. DeVerney fully developed his defense at trial, and it was rejected by the jury, which had before it evidence of DeVerney being with the codefendants during the time Antonich received 50 to 100 blows to the head and body—some of which were personally delivered by DeVerney—his wiping fingerprints off Antonich's car, and his participation in the group's attempt to discard the murder weapon by throwing it off the Blatnik Bridge.

Furthermore, Minn. R.Crim. P. 17.02, subd. 3, makes it clear that the language of the indictment, not the actual statutory citations contained in it, should be relied upon. The rule provides that the

indictment or complaint shall state for each count the citation of the statute, rule, regulation or other provision of law which the defendant is alleged to have violated. Error in the citation or its omission shall not be ground for dismissal or for reversal

of a conviction if the error or omission did not prejudice the defendant.

Minn. R.Crim. P. 17.02, subd. 3. While the statutory reference in the indictment was only to Minn.Stat. §§ 609.185 (murder) and 609.05, subd. 1 (aid and abet), the language of the indictment itself makes plain what the state "basically contended had happened," *Ostrem,* 535 N.W.2d at 923 (quoting *State v. DeFoe,* 280 N.W.2d 38, 40 (Minn.1979)). DeVerney was charged with aiding and abetting the first-degree murder of Antonich during the course of a kidnapping. The indictment charged that: "Andy Leo DeVerney, then and thereby being, individually and aiding and abetting and acting in concert with another" committed murder. This is the charge that was tried to the jury and of which DeVerney was found guilty. The theory of the state's case was that these five men, acting in concert, kidnapped, beat, and murdered Antonich. The additional aiding and abetting instruction does not change this theory. We are satisfied that DeVerney was not substantially prejudiced by the trial court's instructions to the jury on aiding and abetting.

Affirmed.

PAGE, J., took no part in the consideration or decision of this case.