STATE of Minnesota, Respondent,

v.

Maurice Nathaniel WILSON, Appellant.

A16-1294

Supreme Court of Minnesota.

Filed: August 16, 2017

Lori Swanson, Attorney General, Saint Paul, Minnesota; and Michael O. Freeman, Hennepin County Attorney, Jean Burdorf, Assistant County Attorney, Minneapolis, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Saint Paul, Minnesota, Melissa Sheridan, Assistant Public Defender, Eagan, Minnesota, for appellant.

## OPINION

ANDERSON, Justice.

Appellant Maurice Nathaniel Wilson was convicted of first-degree premeditated murder, Minn. Stat. §§ 609.05, .185(a)(1) (2016), on an accomplice-liability theory for his involvement in the murder of Anthony Fairbanks. On appeal, Wilson asserts that the district court made two errors. First, he argues that the district court clearly erred by denying his *Batson* objection to the State's peremptory challenge of pro-

spective juror 29. Second, he argues that the district court abused its discretion by refusing to allow him to develop an alternative theory to explain why the murder weapon was found in a storage unit rented to an alleged accomplice. We affirm.

## FACTS

The facts of this case are fully discussed in our decision in *State v. Onyelobi*, 879 N.W.2d 334 (Minn. 2016).[1] The State's theory in both *Onyelobi* and here was that Anthony Fairbanks was a heroin addict, as were his sister and mother, and that Wilson, Wilson's girlfriend (Maureen Onyelobi), and David Johnson supplied heroin to the Fairbanks family. Typically, Fairbanks or his sister would call a designated telephone number (the 208 number) to arrange a heroin purchase, and Wilson, Onyelobi, or Johnson would answer and make the sale arrangements.

On February 19, 2014, Wilson and Fairbanks were indicted in federal court for conspiracy to sell narcotics. On February 28, 2014, Wilson was arrested on the indictment and detained at the Cass County Jail in Fargo, North Dakota. As of March 8, 2014, the date of Fairbanks's death, authorities had not yet arrested Fairbanks.

That same day, Onyelobi rented a storage unit in Plymouth and was issued a personalized entrance code to the facility. Surveillance video from that day showed Onyelobi arriving in a two-tone van and entering her unit for the first time around 4:15 p.m. She stored a cardboard box and duffel bag in her unit.

At 7:34 p.m., Wilson called Onyelobi at the 208 number from the Cass County Jail. When Wilson asked Onyelobi whether Johnson was with her, she responded affirmatively and told Wilson that Johnson was talking to Fairbanks. Wilson expressed to Onyelobi, and later to Johnson, the urgency in "tak[ing] care of" Fairbanks. Onyelobi and Johnson told Wilson that Fairbanks was never alone. Wilson responded that "the countdown is on," and taking care of Fairbanks should have been the "first thing" they did. The State, in its opening statement, characterized this phone call as Wilson placing a "hit" on Fairbanks.

At 9:02 p.m., Onyelobi returned to her storage unit as a passenger in the two-tone van. After spending approximately 6 minutes in her unit, she returned to the van and left.

Around 9:30 p.m., Fairbanks arrived at his mother's apartment and shortly thereafter told his sister that he was leaving to purchase heroin from Onyelobi. Immediately before Fairbanks left, his mother overheard him tell someone on the phone: "Yeah, Bro, I'm comin' right now, and I'm alone. I'm not coming with anybody. I'm by myself." Later forensic investigation revealed that the person with whom Fairbanks had been talking had called him from the 208 number while located near the area where Fairbanks's body was later found.

Shortly before 10:00 p.m., a witness who lived two blocks from Fairbanks's mother heard three gunshots. From his second-floor window, the witness saw a body lying on the side of the street. A van stopped near the body for 5 to 10 seconds and then drove north. At 10:04 p.m., the witness called 911; the witness later identified the two-tone van owned by Onyelobi as the vehicle he saw that night. Law enforcement personnel recovered four discharged shell casings from the scene. The medical

---

1. Maureen Onyelobi was convicted of first-degree premeditated murder on an accomplice-liability theory, Minn. Stat. §§ 609.05, .185(a)(1), for her involvement in Fairbanks's murder. We affirmed her conviction on direct appeal. *Onyelobi*, 879 N.W.2d at 334.

examiner determined that the cause of death was two gunshot wounds to Fairbanks's head and the manner of death was homicide.

At 10:24 p.m., surveillance video showed Onyelobi's two-tone van return to the storage facility. A male wearing a white jacket with decals left the passenger side of the van and attempted to access the facility using Onyelobi's personalized code. Access was denied because the facility was closed for the night. The next morning, Onyelobi returned to the storage facility, entered her unit, and returned to her van a few minutes later.

On March 11, 2014, police discovered that Fairbanks's sister frequently called the 208 number. Police also were notified of the federal indictment and through this information learned that Wilson was in custody, that Onyelobi was his girlfriend, and that Onyelobi owned a two-tone van matching the one identified by the witness.

Using cell-phone data, police located the phone associated with the 208 number at the Red Roof Inn in Plymouth. Police found the two-tone van in the Red Roof Inn parking lot, and hotel records confirmed that Onyelobi rented a room on March 6, 2014 and was not scheduled to check out until March 15. When officers arrived at Onyelobi's room, Johnson answered the door. From the door, officers could see a racquetball-sized clear plastic bag containing a white substance. Police entered the room, froze the scene, and waited for a search warrant. Onyelobi arrived approximately 30 minutes later. After obtaining the search warrant, police found the phone connected to the 208 number and the white jacket with decals worn by the man who attempted to enter Onyelobi's storage unit on the night of March 8.

Police arrested Onyelobi for possession of a controlled substance and brought her to the police station for questioning. At one point, police left the interrogation room but continued to monitor Onyelobi. They saw her try to insert a small key into an exposed electrical outlet. Officers seized the key and determined that it opened Onyelobi's storage unit. After obtaining a warrant, police searched the storage unit and found a gun, which was later determined to be the weapon that fired the four discharged shell casings found near Fairbanks's body.

Wilson was charged with first-degree premeditated murder, Minn. Stat. §§ 609.05, .185(a)(1) (2016) (Count I), and second-degree intentional murder, Minn. Stat. §§ 609.05, .19, subd. 1(1) (2016) (Count II). Both counts were charged on an accomplice-liability theory. Following a jury trial, Wilson was convicted of both counts, and the district court sentenced him to life imprisonment without the possibility of release on Count I.

## ANALYSIS

### I.

Wilson's first claim on appeal is that the district court clearly erred by denying his *Batson* objection to the State's use of a peremptory challenge to exclude a black prospective juror at trial. We reject Wilson's claim because the district court's conclusion that Wilson failed to establish a prima facie case of racial discrimination was not clearly erroneous.

 "Peremptory challenges allow a party to strike a prospective juror that the party believes will be less fair than some others and, by this process, to select as final jurors the persons they believe will be most fair." *State v. Reiners*, 664 N.W.2d 826, 833 (Minn. 2003). The Equal Protection Clause of the Fourteenth Amendment, however, prohibits purposeful racial discrimination in jury selection. U.S. Const.

amend. XIV, § 1; *Batson v. Kentucky*, 476 U.S. 79, 84, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). To decide whether the exercise of a peremptory challenge violates the Fourteenth Amendment, we follow the Supreme Court of the United States' three-step *Batson* framework for determining whether a peremptory challenge is motivated by racial discrimination. *State v. Moore*, 438 N.W.2d 101, 107 (Minn. 1989) (citing *Batson*, 476 U.S. at 95-97, 106 S.Ct. 1712); *see also* Minn. R. Crim. P. 26.02, subd. 7(3) (using the three-part *Batson* analysis).

■ Under *Batson*, the initial burden rests on the opponent of the challenge— here Wilson—to make a prima facie showing "that the State exercised its peremptory challenge against a prospective juror on the basis of race." *Onyelobi*, 879 N.W.2d at 345 (citation omitted) (internal quotation marks omitted). A party satisfies this burden by showing two things: "(1) that [one or more] member[s] of a racial minority has been peremptorily excluded *and* (2) that circumstances of the case raise an inference that the exclusion was based on race." *Id.* (citation omitted) (internal quotation marks omitted).

■ Once the opponent satisfies this burden, the burden shifts to the party who exercised the peremptory challenge to articulate a race-neutral reason for the challenge. *Id.* "This reason 'need not be "persuasive, or even plausible"'; so long as discriminatory intent is not 'inherent in the prosecutor's explanation, the reason offered [is] deemed race neutral.'" *Id.* (quoting *State v. Diggins*, 836 N.W.2d 349, 355 (Minn. 2013)).

■ Finally, if the party who exercised the peremptory challenge articulates a race-neutral reason for the strike, then "the ultimate burden," *see id.*, rests with the opponent to persuade the district court

that the proffered reason was merely a pretext for the party's true motive: "purposeful discrimination," *State v. Greenleaf*, 591 N.W.2d 488, 500 (Minn. 1999).

■ We give "great deference" to a district court's ruling on a *Batson* challenge and will not reverse the ruling unless it is clearly erroneous. *State v. Martin*, 773 N.W.2d 89, 101 (Minn. 2009). We grant such deference because "the existence of racial discrimination in the exercise of a peremptory strike is a factual determination," and "the record may not reflect all of the relevant circumstances that the court may consider." *Id.* (citation omitted) (internal quotation marks omitted); *see also Diggins*, 836 N.W.2d at 355 ("[D]eference is warranted because the district court occupies a unique position to observe the demeanor of the prospective juror and evaluate the credibility of the party that exercised the peremptory challenge...").

We have emphasized the "importance of clarity at each step of the [*Batson*] analysis" because "the opponent has the burden of proving a prima facie case, the proponent has the burden of production of a race-neutral explanation, and the opponent has the ultimate burden of proving pretext and discriminatory intent." *State v. Pendleton*, 725 N.W.2d 717, 725 (Minn. 2007) (citation omitted) (internal quotation marks omitted). In this case, both the record and the district court's decision are clear.

During voir dire in this case, the State exercised peremptory challenges on two black prospective jurors, Juror 22 and Juror 29. By the time it questioned Juror 29, the State had already exercised five peremptory challenges, excusing three white females, one white male, and one black male (Juror 22). Wilson had exercised nine peremptory challenges by that point, excusing five white males, one white female, two Asian females, and one black male. At

the time of Juror 29's voir dire, the jury consisted of four white males, three white females, one black female, and one Asian male.

### Juror 22

The State's first peremptory challenge against a black prospective juror involved Juror 22. The district court questioned Juror 22 regarding discrepancies between his oral answers to questions during voir dire and his written answers to the jury questionnaire about his criminal record. Juror 22 stated in voir dire that he had a citation in 2000 and domestic incidents in 2001 and 2009. When asked why he did not include these on his questionnaire, Juror 22 responded, "I thought I did."

Wilson asked Juror 22 whether he believed that he was treated fairly in the domestic abuse cases, and Juror 22 responded that, because he is a man, "it's just pretty common that [police are] not going to take her to jail" and that men "don't have a chance when it comes to domestics with a woman." But Juror 22 said that he could set aside his personal experiences if seated as a juror. Wilson accepted Juror 22.

The State exercised an off-the-record peremptory challenge against Juror 22 without questioning him. After the district court excused Juror 22, the State made a record. The State had first asked the district court to excuse Juror 22 for cause because "he did not fully divulge his entire criminal history." The court denied the motion, concluding that Juror 22 was not intentionally trying to deceive the parties about his criminal record; rather, he was not completely forthcoming because he was confused. The State then used one of its peremptory challenges. Wilson did not

object to the State's peremptory removal of Juror 22.[2]

### Juror 29

Juror 29 was the second black prospective juror against whom the State exercised a peremptory challenge. Juror 29 stated during voir dire that he could be an effective juror because he is "fairly intelligent," "analytical," "not overly emotional," and does not "have any sorts of strong feelings one way or the other about participating as a juror." The court asked him about his marriage to a prosecutor and whether he had developed any "pro-prosecution views." Juror 29 responded that he and his wife have their own views and that they debate about the law and the judicial system.

Responding to questions by Wilson, Juror 29 discussed a "very unfortunate situation" in which a police officer pulled a gun on him roughly 3 years earlier. The incident occurred in Saint Paul while he was sitting in his parked car, preparing for a job interview. He saw lights flashing out of the corner of his eye, and because the officer was already approaching his car, he reached to roll down his window. The officer pulled his gun and instructed him first to put his hands on the steering wheel and then to roll down his window. He then explained why he was parked there and that he was almost finished preparing for an interview. The officer "said, 'okay,'" "apologized and .... let [him] on his way." Juror 29 stated that, although this experience did not color his opinion of "necessarily all police in general," given what "parents tell you," "it's not that it was totally surprising to me."

In his questionnaire, Juror 29 had stated that, "[i]n theory [the criminal justice system] works fine; not so much in practice."

**2.** Although Wilson made a record of his reasons for objecting to the challenge for cause, he did not address the State's use of a peremptory challenge.

He elaborated that, "I think maybe we incarcerate more people than any other country in the world, disproportionate amount of those are African American." Juror 29 further stated that, as a juror, "for the system to work well, it would be incumbent upon me to be ... non-partial, not biased, to have an open mind about the evidence, both sides of the evidence and to ... withhold any sort of opinion I had until all the evidence [has] kind of been submitted and heard." Wilson accepted Juror 29.

The State questioned Juror 29 about his wife's work as a prosecutor and their debates about "the system." He explained that he and his wife discuss the judicial system in general, and "things like implicit bias" and "whether or not a jury can be fully impartial going into a trial." And he believed that, based on his view of society as largely divided based on race, "it's a stretch to think that 12 people would be completely impartial going into a jury trial."

The State also asked Juror 29 about the incident with the police officer. Juror 29 "absolutely" believed it was based on race because the officer was white and he "pulled his gun in just a matter of five seconds."

The State then asked Juror 29 about his belief that African Americans are incarcerated at a disproportionate rate. He responded that the disproportionality involves mostly men. He also said that his beliefs would not impact how he viewed a criminal case if he were on a jury. He told the State that he had not interacted with the Minneapolis Police Department and that he did not hold beliefs about that department as a whole.

The State also asked Juror 29 about his wife's interactions with the Minneapolis Police Department as a prosecutor. He told the State that she was involved in the trial of a police officer two weeks earlier, which had ended with the jury unable to reach a verdict on some charges, and an acquittal on others. He said he was disappointed with the result of that trial because he believed that the police officer should have been convicted. Following that statement, the State exercised a peremptory challenge to excuse Juror 29, and Wilson asserted a *Batson* objection.

Wilson argued that Juror 29 presented himself as intelligent, competent, and fair-minded, and although he had experienced unfortunate encounters with police, those encounters "are not uncommon" for an "African American in this country." Wilson asserted that, "[I]t's very difficult to separate someone's being African American from experiences African Americans have. So if the State is excusing [him] because of the experiences that he's had as an African American in our society, that to me is no different than excusing him because of his race."

The district court acknowledged that evaluating a *Batson* objection involves a three-step analysis and that the court needed to begin with step one. The court stated:

> I will say that he certainly has had experiences, which I understand may raise some concerns. The cop with the gun in St. Paul, the general views of the inequity of the system. But I would say he certainly seems to be able to segregate views about those particular experiences with his ability to be a juror in this case.

The court then asked the State for "suggestions" but noted that, "I know you don't have to give a reason until part two." The State responded that, because Wilson had not made a prima facie showing of racial discrimination, "the analysis ends right there." The State pointed out that it "kept a number of minority individuals on our

jury" and that "the defense has struck more minorities than we have." Wilson countered that, of the four black prospective jurors, two were African immigrants from Liberia (Wilson exercised a peremptory challenge to remove one, and the other was seated on the jury) and two were African Americans (the State exercised peremptory challenges to remove both) and that there is "a distinction between the experiences of African immigrants and men similar to Mr. Wilson, who were born and raised in this country." After hearing the arguments of the parties, the court ruled:

> I know the first step is to determine whether there's a prima facie case. And it's attempting [sic] to go into the reasons that are nonracial. I know I can't do that until I get past step one. I understand that [Juror 29 is] an African American man. I get that. Also a very strong, you know, thinker, obviously very intelligent, had experiences that are associated with his race.... But given what the responses were, I can't conclude at this point that there's a prima facie case that's been made for a discriminatory type of strike.

In response to the court's ruling, Wilson sought to further develop the record regarding Juror 22, stating that the defense had been "very close to raising a *Batson* challenge" to Juror 22's removal. Wilson argued that the State's use of a peremptory challenge on both African-American prospective jurors "create[d] a prima facie case" and that the way the State structured the challenge—first using a motion for cause, exercised without asking any questions of Juror 22—was designed to eliminate Wilson's ability to argue step three, "[s]o we didn't do the challenge." Wilson also asserted that "perhaps [he] should have done the challenge at that time. But I think now it is definitely a pattern, where the two people who are

similar to Mr. Wilson have been struck by the state." The State did not respond.

The district court did not reconsider its ruling, but it noted that it was aware of Wilson's concern and that it would "keep [it] in mind if the situation presents itself again. But I still don't think at this point it's gotten to the level of a prima facie case."

Following voir dire that day, the State further developed the record on the *Batson* objection. Although the State believed that the district court made the correct ruling, it wanted to put its race-neutral reasons on the record to "assist the Appellate Court" in the event Wilson appealed. The State asserted that, although Juror 29 was a "thoughtful individual," "a number of his answers regarding things that had happened to him were concerning for the state, totally independent of his race." First, "[h]e had an awful experience with a police officer." Next, "[h]e had strong views on a case that his wife tried, involving a Minneapolis police officer being acquitted of charges that he thought that the officer should have been convicted." Third, "he in general is quite liberal. We've had other quite liberal individuals that we struck who were Caucasian. That had nothing to do with his race."

Wilson responded that Juror 29's views could not "be separated from the fact that he was African American" and that "if the state is allowed to excuse people simply because they hold opinions that are reflective of their experiences of being African American in this country, then it weakens the whole purpose of the [*Batson* objection]."

On appeal, Wilson contends that the district court clearly erred by determining that he failed to make a prima facie showing of racial discrimination. We disagree.

■ . To be sure, the bar is low at the first step of the *Batson* analysis for establishing a prima facie showing of racial discrimination. *See Johnson v. California*, 545 U.S. 162, 170, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005) ("We did not intend the first step to be so onerous that a defendant would have to persuade the judge—on the basis of all the facts, some of which are impossible for the defendant to know with certainty—that the challenge was more likely than not the product of purposeful discrimination. Instead, a defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred."). But we have also held that "mere removal of 'a member of a racial minority does not necessarily establish a prima facie case of discrimination.' " *Onyelobi*, 879 N.W.2d at 345 (quoting *Reiners*, 664 N.W.2d at 831). Rather, an "inference of racial discrimination can be drawn ... upon 'proof of disproportionate impact upon the racial group,' " or "from all other surrounding circumstances, such as 'the prosecutor's questions in voir dire,' the 'stated reasons' for exercising the peremptory challenge, or 'established past patterns' of racial discrimination in the current jury's selection." *Id.* (quoting *Moore*, 438 N.W.2d at 107); *see also State v. DeVerney*, 592 N.W.2d 837, 843 (Minn. 1999) (concluding that a prima facie showing was established when the defendant was a Native American and both Native American jurors were struck); *Greenleaf*, 591 N.W.2d at 501 (same).

■ Here, the State accepted one female African immigrant from Liberia and exercised a peremptory challenge on one African-American male before exercising its peremptory challenge on Juror 29. Wilson asserts that African immigrants should be treated differently from African Americans in a *Batson* analysis. But Wilson has failed to support this argument with any evidence, analysis, or citations to authority. Based on the trial record, therefore, and because the State accepted one black juror, we conclude that Wilson cannot demonstrate that he has met the required standard. *See Diggins*, 836 N.W.2d at 357 (noting that the State accepted an African American juror before striking another potential juror); *State v. Everett*, 472 N.W.2d 864, 869 (Minn. 1991) (considering it "significant that the jury ultimately included a member of a minority" race).

■ But Wilson still could succeed in his prima facie showing if, from "all other surrounding circumstances," he could demonstrate that the "circumstances of the case raise[d] an inference that the exclusion was based on race." *Onyelobi*, 879 N.W.2d at 345 (citation omitted) (internal quotation marks omitted). When engaging in this fact-based assessment, we are "mindful of the unique position of a district court to determine, based on all relevant factors, whether the circumstances of the case raise an inference that the challenge was based upon race." *State v. White*, 684 N.W.2d 500, 506 (Minn. 2004).

■ One surrounding circumstance that Wilson suggests was present was a pattern by the State of improperly striking all African American prospective jurors. However, in *Angus v. State*, we concluded that the "existence of a prior strike of a minority, based on race-neutral reasons that *were not questioned*, does not raise an inference that a subsequent strike of a minority was discriminatory." 695 N.W.2d 109, 117 (Minn. 2005) (emphasis added). Here, although Wilson developed the record regarding the State's peremptory challenge of Juror 22 after the State exercised a peremptory challenge on Juror 29, Wilson did not object to the State's peremptory challenge of Juror 22 at the time it

occurred. Accordingly, under *Angus*, the State's exercise of a peremptory challenge on a second black juror, standing alone, is insufficient to support an inference of discrimination.

■ Another surrounding circumstance, according to Wilson, was that some of Juror 29's life experiences involved first-hand encounters with racism and that the State's attempt to exclude him because of those experiences was improper. In *Pendleton*, one reason given for the State's peremptory challenge was a prospective juror's "attitude toward police in general" following a negative encounter with police. 725 N.W.2d at 725. The State was concerned that the juror's experience might affect her opinion toward police testimony during trial.[3] *Id.* Pendleton argued that a prospective juror's negative encounter with police in a "traffic stop was 'apparently racially-motivated' and the peremptory strike by the state 'assumed that a person subjected to racism is going to have a grudge against the police, and take it out on the State.'" *Id.* at 726. We determined that "these facts raise[d] an inference that the challenge was based on racial factors" and concluded that "Pendleton did make a prima facie showing." *Id.*

Wilson contends that here, as in *Pendleton*, Juror 29's experience with the Saint Paul police officer is intertwined with Juror 29's minority-group status. The State asserts that *Pendleton* can be distinguished because the prospective juror in *Pendleton* was the first minority juror questioned. *Id.* at 724; *see also State v.*

*Taylor*, 650 N.W.2d 190, 201 (Minn. 2002) (agreeing that a prima facie case "was made" when the district court "cit[ed] juror 25's race (biracial with one African American parent and one Caucasian parent) and the fact that she was the first minority juror questioned"). At oral argument the State explained that this distinction matters, claiming that in *Pendleton*, the pool of prospective jurors included very few minority jurors. *See, e.g., Pendleton*, 725 N.W.2d at 724 (explaining the "lack of ethnic balance" in the pool). In *Pendleton*, the State argued that striking the first minority prospective juror when there were so few minority prospective jurors in the pool differs from this case, in which the prospective jury pool included 15 minorities, two of whom were already seated on the jury.

Here, even assuming without deciding that Juror 29's experiences with law enforcement were tied to his race, he also gave conflicting answers during voir dire, lending further support to the district court's decision on step one of *Batson*. On one hand, he told the district court that he could be fair and open-minded—in other words, he could be impartial—but on the other hand, he later told the State that he thought it was "a stretch" to think that a jury "would be completely impartial going into a jury trial." The district court also had to consider potential bias against the State based on Juror 29's beliefs that in practice the criminal justice system does not work as well as it might and that the United States incarcerates a disproportionate number of African American men.[4]

---

**3.** In *Pendleton*, the district court did not conduct the *Batson* analysis properly and allowed the State to respond after the defendant made his *Batson* objection. 725 N.W.2d at 725-26. Here, the district court similarly gave the State an opportunity to respond, but the State declined to do so.

**4.** This case can also be distinguished from *State v. McRae*, 494 N.W.2d 252 (Minn. 1992). In *McRae*, the State used a peremptory challenge to remove the only African American prospective juror from a panel of approximately 25 people. *Id.* at 253. As discussed above, here there were 15 prospective minority jurors, two of whom were already seated

Juror 29 also believed the system failed in a recent trial of a police officer in which he was disappointed with the result because he believed that the officer should have been convicted.

Taking these facts into consideration, and given the low bar for Wilson to establish a prima facie showing of an inference of discrimination, it likely would not have been error for the district court to conclude that Wilson had established a prima facie showing of discrimination. But neither was it error for the district court to conclude that Wilson failed to make a prima facie showing of discrimination. We must give "great deference" to the district court's determination, *Martin*, 773 N.W.2d at 101, because of its "unique position to observe the demeanor of the prospective juror and evaluate the credibility of the [prosecutor]," *Diggins*, 836 N.W.2d at 355. Giving great deference to the district court, we hold that Juror 29's conflicting statements were sufficient to support the district court's conclusion that Wilson failed to make a prima facie showing of racial discrimination.

## II.

■ Wilson next argues that the district court abused its discretion and violated his right to present a complete defense when it granted the State's motion to exclude evidence and argument he offered to explain why police found the murder weapon in Onyelobi's storage unit. Again, we disagree.

■ A criminal defendant has a constitutional right to a meaningful opportunity to present a complete defense. *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *State v.*

*Richards*, 495 N.W.2d 187, 191 (Minn. 1992). But this right is not absolute. *State v. Hannon*, 703 N.W.2d 498, 506 (Minn. 2005). "[C]riminal defendants are bound by the rules of evidence, which are designed to assure fairness and reliability in ascertaining guilt or innocence." *State v. Henderson*, 620 N.W.2d 688, 698 (Minn. 2001) (citing *State v. Tovar*, 605 N.W.2d 717, 722 (Minn. 2000)). "Courts may limit the scope of a defendant's arguments to ensure that the defendant does not confuse the jury with misleading inferences." *State v. Atkinson*, 774 N.W.2d 584, 589 (Minn. 2009) (citing *State v. Davidson*, 351 N.W.2d 8, 13 (Minn. 1984)). "[E]ven when a defendant alleges that his inability to present a defense violates his constitutional rights, evidentiary questions are reviewed for abuse of discretion." *Henderson*, 620 N.W.2d at 698.

At trial, the State sought to persuade the jury that Onyelobi and Johnson had visited Onyelobi's storage locker before and after Fairbanks was shot—first to retrieve, then to return, the gun used in the murder. To counter this theory, Wilson sought to present evidence and argument to the jury that Onyelobi and Johnson were drug dealers, as evidenced by the drugs found in Onyelobi's hotel room at the time of their arrest; and that, like many drug dealers who carry guns for protection, they stored their drugs and gun in separate locations to avoid the more serious penalties that apply when a person is apprehended while possessing drugs and guns together.

Wilson first raised the issue in his opening statement, in which he asserted that

on the jury, and one of whom was black. Also, the court in *McRae* stated that "[b]ecause of a concession by the state, we are not concerned in this case with the requirement that the

defendant first make a prima facie showing of discriminatory exercise of a peremptory challenge." *Id.* at 253-54. That is the precise issue on appeal here.

Onyelobi and Johnson were drug dealers, and

[a]s drug dealers often do, they took a gun with them for protection when they were out dealing drugs. But as many drug dealers know, if they are caught with the gun and the drugs in the same location, the penalties may be higher than just with the drugs alone. So they did not store the gun with the drugs.

Wilson raised the issue again during his cross-examination of a police officer who was present during the search of Onyelobi's hotel room. Over the State's objection, Wilson elicited testimony from the officer that he saw what he believed to be drugs in the room.

The next day, the State moved in limine to preclude additional evidence regarding "drug[s] and the drug sentencing issue," asserting that Wilson had made no offer of proof that either Onyelobi or Johnson knew about "any sort of consequences that would result from keeping firearms and narcotics in the same place." The State contended that, without supporting evidence, the inference that Wilson wanted the jury to draw was purely speculative. Wilson responded that the argument was one theory of the defense's case and that he was entitled to argue reasonable inferences in the closing argument. Wilson also asserted:

There is a law that says, when guns and drugs are found in the same location, the penalty for possessing the drugs is higher. I am allowed to argue that as a reasonable inference.... The guns and drugs being separated, that that was the reason they were kept separate.... If the jury thinks it's a stretch, they'll think it's a stretch.

Wilson argued that Onyelobi and Johnson were "drug dealers" and that "it is a reasonable inference that they would know that such a law exist[s] and would act accordingly."

The district court granted the State's motion. It agreed with Wilson that the alleged existence of drugs in the hotel room and the presence of the gun in the storage locker were facts. But it also agreed with the State that, unless evidence showed that Onyelobi and Johnson knew about the sentencing consequences of possessing drugs and firearms together, Wilson's theory about why the gun and drugs were separated was speculative. The court expressed its willingness to revisit the issue if circumstances changed, but until then Wilson was prohibited from raising the issue.

The district court's decision was not an abuse of discretion because the evidence was irrelevant under the Minnesota Rules of Evidence. "The threshold test for the admissibility of evidence is the test of relevancy." Minn. R. Evid. 401 comm. cmt.—1977. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Minn. R. Evid. 401.

Just as the rules of evidence prohibit the admission of irrelevant evidence, we have also determined that arguments unsupported by evidence in the record are improper. *See, e.g., State v. Pearson,* 775 N.W.2d 155, 163 (Minn. 2009) ("[A] lawyer may not speculate without a factual basis." (citing *State v. Thompson,* 578 N.W.2d 734, 742 (Minn. 1998))); *State v. Wahlberg,* 296 N.W.2d 408, 419-20 (Minn. 1980) ("Counsel have the right to present to the jury all legitimate arguments on the evidence, to analyze and explain the evidence, and to present all proper inferences to be drawn therefrom." (citing *Connolly v. Nicollet Hotel,* 258 Minn. 405, 104 N.W.2d 721, 732 (1960))).

The reason that Onyelobi and Johnson placed the gun in the storage unit was not relevant to any fact of consequence. Wilson's explanation for the gun's location was irrelevant because the evidence at trial established that the gun recovered from the storage unit was the same gun that fired the four discharged shell casings found near the victim's body. Regardless of whether Onyelobi and Johnson placed the gun in the storage unit to keep it separate from drugs, or because they had just used the gun to kill Fairbanks, Wilson's theory does not establish any fact of consequence and accordingly was not relevant to any fact at issue at Wilson's trial.

Further, even if we determine that the evidence was relevant, it still must pass the balancing test in Rule 403, which allows relevant evidence to "be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or *misleading the jury*, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Minn. R. Evid. 403 (emphasis added). We have upheld a district court's decision to exclude evidence that it found "so speculative and confusing that its prejudice exceeds any probative value." *Henderson*, 620 N.W.2d at 699. So too here.

The evidence Wilson sought to offer was speculative and not supported by an offer of proof.[5] When the State subsequently moved to exclude any further evidence regarding drugs and sentencing enhancements, again Wilson made no proffer. Because the evidence Wilson sought to offer was both irrelevant and speculative, the district court did not abuse its discretion by excluding it.

---

5. For example, Wilson could have subpoenaed Onyelobi or Johnson to testify that they were aware of drug-sentencing enhance-

## CONCLUSION

For the foregoing reasons, we affirm Wilson's conviction of first-degree premeditated murder.

Affirmed.

ments. Instead, Wilson made no offer of proof.